IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
EASTERN DIVISION

| | | |
|---|---|---|
| Aaron Farrer, | ) | |
| | ) | Civil Action No. 1:16-cv-3418 |
| Plaintiff, | ) | |
| | ) | Judge: |
| v. | ) | Magistrate Judge: |
| | ) | |
| Indiana University, Jason Casares, Vivian | ) | |
| Hernandez, Amber Monroe, Katheryn A. Shirk, | ) | **JURY DEMAND** |
| Adam J. Herman, Harold Goldsmith, | ) | |
| and Marion Zerfoss, | ) | |
| | ) | |
| Defendants. | ) | |

---

## COMPLAINT

Plaintiff Aaron Farrer ("Farrer"), by and through his attorneys, complains as follows against Defendants: (a) The Indiana University ("IU"), (b) Marion Zerfoss ("Zerfoss"), (c) Jason Casares, IU's Associate Dean of Students and Deputy Title IX Director ("Casares"), (d) Vivian Hernandez, IU's Assistant Director, Office of Student Ethics ("Hernandez"); (e) Amber Monroe, IU's Associate Director, Title IX Deputy Investigator ("Monroe"); (e) Katheryn A. Shirk, IU Hearing Panel member ("Shirk"); (f) Adam J. Herman, Doctoral Candidate, IU's School of Education and Hearing Panel member ("Herman"); and (g) Harold Goldsmith, IU'S Dean of Students ("Goldsmith"). (IU, Casares, Hernandez, Monroe, Shirk, Herman and Goldsmith hereinafter collectively referred to as ("State Defendants."). Together, Casares, Hernandez, Monroe, Shirk, Herman and Goldsmith are referred to as "Individual Defendants."

1

## NATURE OF THE ACTION

1.      Having been irreparably harmed by false allegations of sexual misconduct, Farrer seeks damages and injunctive relief to remedy emotional, mental, economic, and physical harm caused by Defendants. Farrer's causes of action include: defamation, intentional infliction of emotional distress, violations of Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*, violations of the Fifth and Fourteenth Amendments to the Indiana & United States Constitutions, 42 U.S.C. §1983; and breach of contract.

2.      For example, IU violated Title IX by creating a gender biased, hostile environment against males, like Farrer, based in part on IU's pattern and practice of disciplining male students who accept physical contact initiated by female students, but failing to discipline female students who engage in the same conduct.

3.      In addition, Individual Defendants violated the Fifth and Fourteenth Amendments to the Indiana & United States Constitutions, which provide that no person shall be deprived of life, liberty, or property without due process of law.  Similarly, the Indiana constitution guarantees every person injured in his person, property or reputation have remedy by "due course of law." The Due Process clauses of the Indiana and United States Constitutions are implicated by higher education disciplinary decisions.

4.      State Defendants also violated IU policies by improperly and unlawfully applying and/or breaching these policies and/or the implied covenant of good faith and fair dealing inherent in these policies.

5.      Farrer's harm stems from unlawful discipline State Defendants imposed on Farrer after Zerfoss filed a complaint on or about September 28, 2015 that falsely alleged Farrer sexually assaulted Zerfoss on or about September 25, 2015.

6.      Farrer did not sexually assault Zerfoss.  Rather, on September 25, 2015, Zerfoss initiated all relevant physical contact with Farrer. The following actions or admissions by Zerfoss demonstrate that she initiated and consented to all contact with Farrer on September 25, 2015:

(a) Zerfoss admits flirting with Farrer and inviting him into her bedroom;

(b) Zerfoss admits asking Farrer to retrieve her vibrator;

(c) Zerfoss admits asking Farrer to "fuck her;"

(d) Zerfoss admits telling Farrer that "it was okay" to have sex despite his hesitations; and

(e) Zerfoss admits that she consented to sex, but that Farrer should have resisted the seduction because she had consumed alcohol that evening.

(*See Exhibit 1, File of the IU Office of Student Ethics*[1]) Zerfoss' position is best summed up in the following quote she made to the Bloomington Police Department: "I was, like, telling him, like, to have sex with me," she said in a report to Bloomington police two days after the incident. "I'm not disagreeing that I might have said that. What I'm saying is I was way too drunk and everyone knows that he was sober. You can't have sex with a drunk girl like that." *Exhibit 1, pp. 187; Exhibit 15, containing transcription of portions of Zerfoss' police interviews.*

7.      Upon information and belief, [2] Zerfoss acted with malice when she falsely told IU that Farrer sexually assaulted her in part because she needed an excuse to hide her embarrassment

---

[1] Farrer obtained the file attached as *Exhibit 1* from a subpoena issued to IU as part of a criminal proceeding. IU handnumbered the pages of the file in the bottom right-hand corner. IU withheld pages 28-49 from the production of this file. When referring to a specific page herein, the references are to the hand-numbered pages.

[2] It should be noted, the "information and belief" allegations in the Complaint are based on at least the following two factors: (1) the evidence referenced and/or exhibits attached to this Complaint which provide a plausible basis for Farrer's "information and belief" allegations; and (2) Farrer's belief that Defendants are in possession and/or control of additional evidence supporting Farrer's "information and belief" allegations that Farrer believes he will obtain in discovery, such as evidence of discriminatory treatment of other similarly situated male students.

about initiating sexual contact with Farrer.  Evidence supporting this belief includes, but is not limited to, the statements she and her friends' made to IU, which are attached at *Exhibit 1*, *pp 19-56, 88-96*.

8.    Upon information and belief, State Defendants knew that Farrer had not sexually assaulted Zerfoss and that Zerfoss had initiated and/or consented to all physical contact with Farrer. (*See* IU Documents)

9.    Nevertheless, during the fall of 2015, IU engaged in a gender-biased investigation of Farrer, which culminated in Farrer's unlawful expulsion from IU. In doing so, State Defendants violated Farrer's Constitutional rights under the Indiana and United States' Constitutions, Title IX, and/or IU's disciplinary policies which include, but are not limited to, policies such as IU's Code of Student Rights, Responsibilities & Conduct ("CSRRC") http://studentcode.iu.edu/about/index.html (accessed 9/26/16), in particular CSRRC: Responding to Incidents Involving Allegations of Sexual Misconduct by Other Students; IU's Sexual Misconduct Policy (*Exhibit 1, pp. 14-18*; and IU's anti-discrimination policies http://trustees.iu.edu/resources/non-discrimination-policy.shtml (accessed 9/22/16); IU's Sexual Misconduct Policy (*Exhibit 19*)  (These IU policies and any IU policy applicable to Farrer's disciplinary procedure are collectively referred to as "IU Policies").

### THE HISTORY OF IU'S UNLAWFUL DISCIPLINE OF FARRER

10.    On April 11, 2011, the United States Department of Education's ("DOE") Office of Civil Rights ("OCR") sent a "Dear Colleague" letter to colleges and universities with instructions on how to comply with Title IX when investigating and resolving complaints of sexual misconduct. ("2011 Dear Colleague Letter") (available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html accessed 9/26/16).  This

4

letter echoes the mandates of President Obama's Administration that Colleges like IU equate "victim/complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.  For instance, the 2011 Dear Colleague Letter:

a) states: "1 in 5 _women_ are victims of completed or attempted sexual assault while in college' . . . [a]dditionally, the likelihood that a _woman_ with intellectual disabilities will be sexually assaulted is estimated to be significantly higher than the general population.  The Department is deeply concerned about this problem . . . ." *2011 Dear Colleague Letter*, p.2 (emphasis added);

b) warns that "the majority of campus sexual assaults occur when _women_ are incapacitated, primarily by alcohol." *Id.,* (emphasis added);

c) suggests educational institutions seek grants from the U.S. Department of Justice's Office on Violence against Women, which require institutions "develop victim service programs and campus policies that ensure victim safety, [and] offender accountability. . . ." *Id.,* p.19 (emphasis added); and

d) warns education institutions that they must "never" view the "victim at fault for sexual violence" if she has been using "alcohol or drugs."  In fact, OCR asks "schools to consider" providing students who violate alcohol or drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs. *Id.* p.15.

11.    In order to provide females preferential treatment, the 2011 Dear Colleague Letter also imposed numerous mandates to make it more difficult for males accused of sexual misconduct to defend themselves.  For example, the 2011 Dear Colleague Letter required schools adopt the lowest burden of proof—"more likely than not"—in cases involving sexual misconduct, including assault. Several colleges had been using "clear and convincing" and some, like Stanford, applied the criminal standard, "beyond a reasonable doubt." The 2011 Dear Colleague Letter also mandated schools "minimize the burden on the complainant." *The 2011 Dear Colleague Letter*, pp.15-16.

12.    Similarly, on April 29, 2014, OCR published a document signed by OCR's assistant secretary of education Catherine E. Lhanon ("Sec. Lhanon") titled "Questions and Answers on Title IX and Sexual Violence." ("OCR's 2014 Q&A") (available at

http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf accessed 9/26/16).  OCR's

2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing

or eliminating the ability to expose credibility flaws in the allegations made against them.  For

example, OCR's 2014 Q&A states schools:

> a) "[M]ust not require a complainant to be present" at sexual misconduct disciplinary hearings."  *OCR's 2014 Q&A,* p.30;

> b) May decide to eliminate all opportunities for "cross-examination." *Id.,* p.31; and

> c) Must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event."  *Id.,* pp.30, 38.

13.     Neither OCR's 2014 Q&A nor the 2011 Dear Colleague Letter were subject to

notice-and-comment rulemaking, and therefore their validity as binding law is at best questionable.

As a result, Senator James Lankford wrote to the DOE on January 7, 2016 to express his concerns

that the DOE's Dear Colleague letters are not interpretive, but are unlawfully altering the

regulatory and legal landscape of Title IX and the U.S. Constitution. https://www.thefire.org/sen-

james-lankford-letter-to-the-education-department/   (accessed   9/26/16).   Following   Senator

Lankford's letter, Representative Earl Ehrhart from Georgia filed a lawsuit against the DOE on

April 21, 2016 in the United States District Court for the Northern District of Georgia alleging that

the DOE's implementation of the 2011 Dear Colleague letter was unconstitutional and unlawful.

*See*   http://www.saveservices.org/wp-content/uploads/Ehrhart-v.-DOE-2016.pdf   (accessed

9/26/16).

14.     Similar allegations were made against DOE in two federal lawsuits.  The first is

*Neal v. Colorado State Univ.-Pueblo, et al., Case No. 1:16-cv-00873,* which was filed on April 19,

2016 in the United States District Court for the District of Colorado.  The second is *John Doe v.*

*Lhamon et al.,* which was filed in United States District Court for the District of Columbia. (*Exhibit 2*).  This Complaint contains the following information about how OCR is pressuring colleges around the county to make it more difficult for male students' accused of sexual misconduct to defend themselves:

a)  "Princeton University . . . continue[d] to use a 'clear and persuasive evidence' standard after publication of the [2011 Dear Colleague Letter.  As a result] OCR informed Princeton in a letter dated November 5, 2014 that its policy 'did not provide for an adequate, reliable and impartial investigation.' In a 'Resolution Agreement' accompanying that letter, OCR required Princeton to adopt 'the proper standard of review of allegations of sexual misconduct (preponderance of the evidence).'"

b)  " . . .  in a letter dated December 30, 2014, OCR informed Harvard Law school (HLS) that the sexual misconduct policy it continued to use after publication of the [2011 Dear Colleague Letter] ***improperly*** used a 'clear and convincing' evidence standard of proof in its Title IX grievance procedures, ***in violation of Title IX***. [emphasis in original]. The letter confirmed elsewhere that '[t]his higher standard of proof was inconsistent with preponderance of the evidence standard required by Title IX for investigating allegations of sexual harassment or violence,' by January 15, 2015, procedures 'that comply with the applicable Title IX regulations and OCR policy,' which procedures must include, among other things, '[a]n explicit statement that the preponderance of evidence standard will be used for investigating allegations of sexual harassment or violence."

c)  "In a letter dated October 31, 2013, OCR notified the State University of New York (SUNY) System that '[t]he grievance procedures used by' Buffalo State 'do not specify whether the arbitrator should use the preponderance of evidence standard in investigating allegations of sexual harassment' and further that Morrisville State College 'fail[ed] to . . use the preponderance of the evidence standards to investigate allegations of sexual harassment." It ordered the SUNY System to 'revise the SUNY system grievance procedures to ensure that these comply with the requirements of Title IX; including using the preponderance of evidence standard to investigate allegations of sexual misconduct.'"

d)  "OCR has ordered at least two schools to adopt grievance procedures that explicitly forbid parties from directly cross-examining each other in sexual misconduct disciplinary proceedings despite the fact that the [2011 Dear Colleague Letter] states that personal cross-examination is only 'strongly discouraged.'"

e)  "in a Resolution Agreement with Rockford University signed on April 24, 2015, OCR required Rockford University to present to OCR for review a draft Title IX policy that stated, among other things, that 'the parties may not personally question or cross-examine each other during the hearing.'"

f) " . . . in a resolution agreement with Southern Virginia University entered on or around December 23, 2014, OCR required Southern Virginia University to draft, by March 31, 2015, Title IX grievance procedures that stated, 'if cross-examination of parties is permitted . . . the parties will not be permitted to personally question or cross-examine each other.'" *Id.,* pp. 13-15, ¶¶47-52.

15.     As a result, IU has treated the 2011 Dear Colleague Letter as law and revised IU policies    accordingly.    http://www.idsnews.com/article/2015/04/call-for-consent    (accessed 9/26/16).

16.     Upon information and belief, this occurred in part  because in February 2014, Sec. Lhanon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington." *See, Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases, Chronicles of Higher Education, February 11, 2014,* located at http://chronicle.com/article/Colleges-Are-Reminded-of-144703/ (accessed 9/26/16)

17.     Consistent with this message from Sec. Lhanon, in March 2014, IU became ensnared in an investigation by DOE's OCR because of its handling of sexual assault and harassment complaints.    (*Exhibit 3* containing DOE Announcement of Higher Education Institutions Investigation);   http://news.iu.edu/releases/iu/2014/05/iu-responds-to-department-of-education-claims-of-title-ix-investigation.shtml (accessed 9/26/16). DOE's OCR opened a second investigation  into  IU's  sexual  assault  and  harassment  policies  in  June  2015. http://www.idsnews.com/article/2016/02/iu-currently-under-two-title-ix-investigations (accessed 9/26/16). Upon information and belief, IU may face another investigation from the DOE because an IU student filed a complaint with DOE's OCR alleging IU did not adequately investigate her sexual assault allegations, in part because Defendant Casares was biased due to sexual assault

allegations brought against him.[3] http://www.idsnews.com/article/2016/03/iu-student-files-federal-title-ix-complaint (accessed 9/26/16).

18.     The DOE's efforts to encourage colleges and universities to discipline aggressively male students have been effective. A recent study demonstrates that 99% of college students accused of sexual assault are males. https://www.ue.org/uploadedFiles/Confronting%20Campus%20Sexual%20Assault.pdf (accessed 9/25/16).

19.     Upon information and belief, OCR's investigations of IU involve complaints filed by females who claimed IU failed to discipline males adequately for sexual misconduct. Evidence supporting this belief, includes, but is not limited to, OCR's heavily redacted June 7, 2016 response to a Freedom of Information Act Request ("FOIA") (*Exhibit 4*). OCR's FOIA response identifies at least two gender based Complaints out of four complaints against IU which – when references to gender are not completely redacted – prove females filed the complaints. *See generally, Id.*, pp. 38, 64 (referring to complainants in two OCR investigations as "her"); *Id.,* p.68 (detailing how a

---

[3] Upon information and belief, IU effectively terminated Casares based on the allegations made against him. Briefly, Casares was accused of sexually assaulting a colleague at a higher education conference after she had too much to drink in December 2015. After news of this accusation became public, Tony Paganelli, Casares' lawyer, released a statement calling the allegations against Casares false. According to the statement, IU officials had concerns about whether Casares could credibly preside over student sexual assault investigations after having been publicly accused of sexual assault himself. "IU therefore asked him to resign his position or be terminated," according to the statement. http://www.huffingtonpost.com/entry/jason-casares-resigns-sexual-assault_us_56d081d1e4b03260bf769320 (accessed 9/26/16). Casares later wrote in a blog post that IU's handing of the false allegations against him put IU: "in an unenviable position of choosing sides between loyalty and brand." In making this comment, Casares details IU's willingness to protect its "brand" even if it means punishing someone who has been falsely accused of sexual misconduct. http://jasoncasares.blogspot.com/2016/04/faith-and-belief-in-system-my-story-my.html. (*Exhibit 13*, containing Casares' blog). The evidence proves Casares' "brand" concerns are accurate in part because after Casares' employment at IU ended, IU performed a perfunctory review of 17 sexual assault cases in which Casares was involved to determine if there was any bias against female students and found no such bias. As a result, the decision in all 17 cases remained the same. http://www.idsnews.com/article/2016/04/jason-casares-will-not-face-criminal-charges (accessed 9/26/16)

female complainant alleged defects in IU's handling of her complaint of sexual violence by another student); *Id.,* p. 38 (same).

20.     At all times relevant to this Complaint, IU's investigations by DOE's OCR were ongoing. Upon information and belief, during these investigations, OCR pressured IU to equate "complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.   Unfortunately, IU is only one of many institutions subject to these types of OCR investigations.  *See e.g.,* Nick Anderson, *Tally of Federal Probes of Colleges on Sexual Violence Grows 50 Percent Since May,* WASH POST, Oct. 19. 2014, https://www.washingtonpost.com/local/education/tally-of-federal-probes-of-colleges-on-sexual-violence-grows-50-percent-since-may/2014/10/19/b253f02e-54aa-11e4-809b-8cc0a295c773_story.html   (accessed   9/26/16);   http://projects.chronicle.com/titleix/cases (containing database of information related DOE's Title IX investigations of colleges and universities since 2011  accessed 9/26/16).

21.     OCR's investigations primarily involve females alleging the universities they attend condone sexual harassment and/or sexual violence by males. These complaints by female students have triggered OCR investigations of academic institutions that include, but are not limited to: (i) the University of Virginia; (ii) Southern Methodist University; (iii) Yale University; (iv) George Washington University; (v) Tufts University; and (vi) the University of Montana in Missoula.  *See generally,*  http://www2.ed.gov/documents/press-releases/university-virginia-letter.pdf (containing OCR's letter to the University of Virginia regarding OCR's Title IX investigation   (accessed   9/26/16);   http://www2.ed.gov/documents/press-releases/southern-methodist-university-letter.pdf  (containing OCR's letter to Southern Methodist University regarding   OCR's   Title   IX   investigation   accessed   9/26/16);

http://www2.ed.gov/about/offices/list/ocr/docs/investigations/01112027-a.html (containing OCR's letter to Yale University regarding OCR's Title IX investigation accessed 9/26/16). http://www2.ed.gov/about/offices/list/ocr/docs/investigations/11112079-a.pdf (containing OCR's letter to George Washington University regarding OCR's Title IX investigation (accessed 9/26/16); and http://www2.ed.gov/about/offices/list/ocr/docs/investigations/01102089-a.html (containing OCR's letter to Tufts University regarding OCR's Title IX investigation (accessed 9/26/16).

22.     Many academics and organizations have raised alarms that DOE/OCR's worthwhile goal of protecting female college students from sexual misconduct has evolved into an unlawful example of federal governmental overreach that violates the rights of male students who never engaged in misconduct. *See e.g., Open Letter From Sixteen Members of Penn Law School Faculty* (Feb. 17. 2014), http://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/02/19/open-letter-from-16-penn-law-school-professors-about-title-ix-and-sexual-assault-complaints/ (accessed 9/26/16) ("Although we appreciate the efforts of Penn and other universities to implement fair procedures, particularly in light of the financial sanctions threatened by OCR, we believe that OCR's approach exerts improper pressure upon universities to adopt procedures that do not afford fundamental fairness."); Emily D. Safko, *Are Campus Sexual Assault Tribunals Fair?: The Need For Judicial Review and Additional Due Process Protections In Light of New Case Law,* 84 Fordham Law Review (2016); Barclay Sutton Hendrix, *A Feather On One Side, A Brick On The Other: Tilting The Scale Against Males Accused of Sexual Assault In Campus Disciplinary Proceedings*, 47 Ga. L. Rev. 591, (2013); Stephen Henrick, *A Hostile Environment for Student Defendants*: *Title IX and Sexual Assault on College Campuses,* 40 N. Ky. L. Rev. 49 (2013); *Rethink Harvard's Sexual Harassment Policy,* LETTER TO

EDITOR, BOSTON GLOBE, Oct. 15, 2015, http://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html (accessed 9/26/16); Emily D. Safko, *Are Campus Sexual Assault Tribunals Fair?  The Need For Judicial Review And Additional Due Process Protections In Light Of New Case Law*, 84 Fordham L. Rev. 2289 (2016); Janet Halley, *Trading the Megaphone for the Gravel Gavel in Title IX Enforcement,* HARV. L. REV. F. 103, 103-17, (2014); Samantha Harris, *Campus Judiciaries on Trial: An Update from the Court,* HERITAGE FOUNDATION, Oct. 6. 2015; http://www.heritage.org/research/reports/2015/10/campus-judiciaries-on-trial-an-update-from-the-courts (accessed 9/26/16); Janet Napolitano, *"Only Yes Means Yes": An Essay on University Policies Regarding Sexual Violence and Sexual Assault,* Yale Law and Policy Review Volume 33; Issue 2 (2015); Robin Wilson, *Presumed Guilty,* CHRONICLE OF HIGHER EDUCATION (Sept. 3. 2014) http://chronicle.com/article/Presumed-Guilty/148529/?cid=a&utm_medium=en (accessed 9/26/16); ("Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."); *Dershowitz and Other Professors Decry 'Pervasive and Severe Infringement' of Student Rights,* Jacob Gershman (May 18, 2016), http://blogs.wsj.com/law/2016/05/18/dershowitz-and-other-professors-decry-pervasive-and-severe-infringement-of-student-rights/ (accessed 9/26/16).

23.    As detailed in many of the publications cited above, OCR's investigations put millions of dollars in federal student aid at risk. This is because DOE/OCR can impose civil

penalties and/or suspend institutions from participating in federal student financial aid programs if DOE/OCR finds a university, such as IU, did not do enough to discipline males alleged to have engaged in sexual misconduct with female students.  Sec. Lhanon confirmed this risk of losing federal funds at a national conference at Dartmouth in the summer of 2014 when she said, "I will go to enforcement, and I am prepared to withhold federal funds." *See, How Campus Sexual Assaults Came to Command New Attention,* NPR, August 12, 2014 located at http://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention (accessed 9/26/16).

24.     In June 2014, Sec. Lhanon told a Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . . ."  In addition, Sec. Lhanon noted:

> "If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education. OCR has not had to impose this severe penalty on any institution recently because our enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments."

http://www.help.senate.gov/hearings/sexual-assault-on-campus-working-to-ensure-student-safety (accessed 9/26/16).

25.     For IU, the withdrawal of federal funding would be catastrophic in part because, upon information and belief, IU Bloomington's undergraduate students received approximately $27,000,000 in Pell Grants and over $79,000,000 in Federal Student Loans in 2015. *See generally http://nces.ed.gov/collegenavigator/?q=indiana+university&s=all&id=151351* (accessed 9/26/16).

26.     As detailed in some of the publications cited above, OCR investigations put immediate and tremendous pressure upon universities and State Defendants to: (a) severely discipline male students alleged to have engaged in sexual misconduct regardless of their innocence, and (b) equate "victim/complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.

27.     Upon information and belief, OCR pressured IU to change its burden of proof for sexual misconduct offenses from clear and convincing to a preponderance of the evidence standard.  Upon information and belief, IU agreed to this change to make it easier for employees such as Individual Defendants to: (a) find accused male students responsible in sexual misconduct cases, even if it meant depriving these accused male students of their Constitutional rights; and (b) equate "complainants" in sexual misconduct proceedings as being females who must receive preferential treatment in part because of pressure from the federal government.

28.     Like the academics above, IU faculty raised concerns about IU's adoption of a preponderance of the evidence standard. In fact, on February 24, 2015, IU's University Faculty Council noted: "we express our serious concern about the propriety and constitutionality of the "preponderance of the evidence" standard mandated by the Office of Civil Rights; that issue remains     to     be     resolved     by     the     courts." http://www.indiana.edu/~ufc/docs/circulars/AY15/UFCSMResolution.pdf (accessed 9/26/16).

29.     The use of the preponderance of the evidence standard has also been challenged in a paper submitted by the American Association of University Professors in March 2016, shortly after Farrer was found responsible. (*Exhibit 5* containing AAUP paper).

30.     Therefore, upon information and belief, pressure from governmental agencies such as OCR/DOE and/or internal forces at IU, caused State Defendants to take unlawful and gender

biased disciplinary actions against Farrer. Evidence that this disciplinary action was based on unlawful gender discrimination includes, but is not limited to IU's pattern and practice of taking unlawful disciplinary actions against male students such as Jeremiah Marshall who filed a complaint against IU in 2015. *See generally, Marshall v. Indiana Univ.,* Case No. 1:15-cv-00726, 2016 U.S. LEXIS 32999, **3-4, 18-19 (S.D. Ind. Mar. 15, 2016)(discussing how the plaintiff established a claim of "selective, gender-based enforcement" because after being charged with sexual misconduct, plaintiff informed defendant university that he "had been sexually assaulted by another female student . . . [yet] Defendants never investigated [Farrer's] reported sexual assault.").

31.     In addition, upon information and belief, IU adopted gender-biased policies and procedures for addressing complaints of sexual assault in order to avoid negative publicity that the university did not adequately handle sexual assault investigations. IU was motivated at least in part to avoid negative publicity by campus advocates, to counteract the allegations of sexual assault against Defendant Casares, and to avoid and/or limit the impact http://www.forbes.com/sites/hbsworkingknowledge/2016/08/10/prospective-students-steer-clear-of-schools-rocked-by-scandal/#2277f4e27428

32.     IU's pattern and practice of gender discrimination against male students is also detailed in the lawsuit of *John Doe v. Indiana University, et al., Case No.1:16-cv-2236 (S.D. In. Aug. 23 2016)*, which is hereby incorporated by reference and shows: (a) another male student was falsely accused of sexual misconduct while a student at IU; (b) this male student was investigated and unlawfully disciplined by IU during a disciplinary procedure that began on or about November 4, 2015 and ended on or about January 27, 2016; and (c) how IU employees including, but not

limited to Defendant Casares, engaged in the gender-biased enforcement of IU Policies to achieve the gender-biased result of finding the male student responsible and avoiding negative publicity.

33.     IU's pattern and practice of gender discrimination against male students also includes the affidavit of Attorney Katherine Liell in *Exhibit 6* which detail IU's pattern and practice of discriminating against and treatling unfairly males who have been accused of sexual assault.

34.     In addition, based on the information detailed in this Complaint and upon information and belief, State Defendants' unlawful discipline of Farrer occurred in part because of State Defendants' archaic assumptions that female students do not sexually assault their fellow male students because females are less sexually promiscuous than males. Evidence supporting this belief, includes, but is not limited to, State Defendants' coordinated campaign to: (a) unlawfully reject the preponderance of evidence which proved Zerfoss voluntarily initiated and/or consented to all physical contact with Farrer when Zerfoss was not incapacitated by alcohol; (b) ignore testimony by Zerfoss and/or her witnesses that established Farrer's innocence in part because that testimony was internally inconsistent and lacked credibility; and (c) unlawfully discipline Farrer for  accepting Zerfoss's offer to engage in promiscuous behavior that Zerfoss, in retrospect, later regretted engaging in. (IU Documents). *See generally*, *Exhibit 1*.

35.     In engaging in the conduct detailed in the preceding paragraph, State Defendants violated OCR's guidance regarding the credibility of the parties and the presence of corroborating evidence.  *See generally, OCR's Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* ("OCR's Sexual Harassment Guide") (January 2001) (available at https://www2.ed.gov/offices/OCR/archives/pdf/shguide.pdf accessed 9/26/16.  For example, OCR's Sexual Harassment Guide recommends evaluating the "relative credibility" of evidence by looking at the level of detail and consistency of each person's account

. . . in an attempt to determine who is telling the truth. Another way to assess credibility is to see if corroborative evidence is lacking where it should logically exist." *OCR's Sexual Harassment Guide,* p.9. *See generally*, *Infra,* pp. 27-38  (discussing Farrer's Enrollment at IU and interactions with Zerfoss); and pp. 38-56 (discussing IU's Investigation and Discipline of Farrer).

36.     Upon information and belief, State Defendants ignored the exculpatory evidence establishing Farrer's innocence in part because of fear that President Obama's Administration might cut off IU's access to federal funding if State Defendants did not provide preferential treatment to females such as Zerfoss.  Evidence supporting this belief includes The White House's April 2014 report entitled "Not Alone" which threatens the elimination of federal funds by stating: "If OCR finds a Title IX violation, the school risks losing federal funds." www.whitehouse.gov/sites/default/files/docs/report_0.pdf accessed 9/26/16)

37.     The White House also noted that:

> The Justice Department (DOJ) . . .  shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance review of schools receiving DOJ financial assistance. If schools are found to violate Title IX and a voluntary resolution cannot be reached, DOJ can . . . seek to terminate DOJ funds.

www.whitehouse.gov/sites/default/files/docs/report_0.pdf (accessed 9/26/16)

38.     President Obama's federal funding threats dovetail with his Administration's "It's On Us" campaign that states: "[a]n estimated one in five women has been sexually assaulted during her college years. . . ."  https://www.whitehouse.gov/blog/2014/09/19/president-obama-launches-its-us-campaign-end-sexual-assault-campus (accessed 9/26/16); https://www.whitehouse.gov/the-press-office/2014/04/29/fact-sheet-not-alone-protecting-students-sexual-assault       (accessed 9/26/16).

39.     Upon information and belief, in response to pressure from the DOE/OCR, IU joined the "It's On Us" Campaign. https://studentaffairs.indiana.edu/dean-students/sexual-violence/its-

on-us/index.shtml (accessed 9/26/16). In fact, IU not only joined the "It's On Us" campaign amidst the DOE investigation, but also uses the "It's On Us" logo as the cover of its "Indiana University Office of Student Welfare & Title IX Annual Report, 2014-2015". http://studentwelfare.iu.edu/files/docs/Office%20of%20Student%20Welfare%20and%20Title%20IX%2014-15%20Annual%20Report.pdf (accessed 9/26/16). Thus, upon information and belief, the current Title IX enforcement at IU is being largely driven by federal directives such as the "It's On Us" campaign.

40.     However, IU and the Obama Administration's allegations that 20% of America's female college students are being sexually assaulted by their male counterparts is false. For example, over 90% of the colleges and universities in the United States reported **none** of their students were raped in 2014. *See generally, Exhibit 7.* Similarly, in 2014, IU reported 22 rapes among its student body of over 38,000 students on its Bloomington Campus. In 2013, IU reported 21 rapes on its Bloomington Campus. https://protect.iu.edu/police-safety/annual-reports/ (accessed 9/26/16)   *See also,* https://www.indiana.edu/about/rankings-statistics.html (accessed 9/26/16); http://ope.ed.gov/security/InstList.aspx (accessed 9/26/16).

41.     Nevertheless, IU routinely portrays a large portion of their male students as sexual predators. For example, IU relied on its October 2015 Sexual Assault Climate Survey, in which only 17% of the student population participated, to publicize via its website, a news release and a letter from the President and Provost that IU's statistics mirror the statistic that 1 in 5 college women are raped. http://stopsexualviolence.iu.edu/ (accessed 9/26/16).

42.     Similarly, even though academic studies suggest a high percentage of rape allegations are false,[4] IU informs its employees that "1 in 5 women report a sexual assault during

---

[4] *See e.g.,* Edward Greer, *The Truth behind Legal Dominance Feminism's Two-Percent False Rape Claim Figure,*          33          Loy.          L.A.L.          Rev.          947(2000);

their undergraduate college experience." http://stopsexualviolence.iu.edu/employee/index.html
(accessed 9/26/16). In addition, in March 2016, IU provided training to its faculty implying that
33% of senior collegiate women have been the victims of sexual violence during their
undergraduate                                                                                experience.
http://nsse.indiana.edu/pdf/presentations/2016/NASPA_2016_Hurtado_BrckaLorenz_slides.pdf
(accessed 9/26/16). Further, IU uses the following handout to train its employees that 1 in 5 college
women are sexually assaulted during their undergraduate years. *See Exhibit 8*, *Responding to
Sexual Misconduct An Employee Guide (IU Bloomington)*.

43.     Although State Defendants will likely allege IU's enforcement of sexual
misconduct policies and the White House's "It's On Us" campaign are gender neutral, both are
irreparably tainted by gender bias against male students. http://news.indiana.edu/releases/iub/iu-
in-the-news/dnb-10-21-2015.shtml (accessed 9/26/16).   For example, IU reports that for sexual

---

http://digitalcommons.lmu.edu/cgi/viewcontent.cgi?article=2216&context=llr.  For example, Greer writes,
"It is indisputably true that, largely through the efforts of legal dominance feminists, there now exists a
consensus among legal academics that only two percent of rape complaints are false. This purportedly
empirical statement is ubiquitously repeated in legal literature. Dozens of law review articles reiterate that
no more than one in fifty rape complaints is false. This empirical fact, however, is an ideological
fabrication." *Id.*  Then, in an extremely detailed study of "academic archeology" Greer shows how this 2%
figure is not based on known academic studies at all but rather it is based on , "feminist publicist Susan
Brownmiller's interpretation of some data, now a quarter-century old (1974), of unknown provenance from
a single police department unit. There are no other published studies that this author could find...Whether
that original source was a press release, a more formal report, or simply an oral statement to a reporter,
remains lost in antiquity."  *Id.  See also,* Eugene J. Kanin, *False Rape Allegations* Archives of Sexual
Behavior, Vol. 23 No.1 (1994) available  https://archive.org/details/FalseRapeAllegations (accessed
9/26/16).  Kanin's report appears in a peer reviewed journal. In summary, his study found that in a small
Midwestern city, 41% of all rape charges were false accusations, that is, admittedly false by the
complainants themselves. There is an addendum to the article describing how they then repeated their study
at two Midwestern universities and found the number to be 50%.  The report goes on to note: "[i]n 1988,
we gained access to the police records of two large Midwestern state universities. With the assistance of
the chief investigating officers for two large Midwestern state universities. With the assistance of
examined. Since the two schools produced a roughly comparable number of rape complaints and false rape
allegations, the false allegation cases were combined, n = 32. This represents exactly 50% of all forcible
rape complaints reported on both campuses. Quite unexpectedly then, we find that these university women,
when filing a rape complaint, were as likely to file a false as a valid charge."

assaults "[w]omen are largely the targets and men are largely the perpetrators," and that their consent education efforts are geared towards males because "[m]ore than 20 percent of all male respondents reported that people who drink heavily could still give consent." http://news.indiana.edu/releases/iub/iu-in-the-news/dnb-10-21-2015.shtml (accessed 9/26/16).

44.     In addition, Vice President Joe Biden has made it clear that the purpose of the "It's On Us" campaign is to protect female students from male students. *See e.g.,* https://www.osu.edu/buckeyesact/vpbidenvideo.html (accessed 9/26/16). VP Biden also made it clear that President Obama's Administration and the DOE used Title IX investigations and potential loss of federal funding to encourage university presidents to join the campaign. *Id.* In addition, VP Biden encourages "guys" to take the "It's On Us" pledge to combat the fact that 1 in 5 college women are the victim of sexual assault while attending college. *Id.*

45.     As a result, IU encourages its faculty, staff and students to take the "It's On Us" pledge which seeks to protect female students from male students with statements such as:

a.   "It's on us to make sure *guys* know that if *she* doesn't or can't consent to sex, it's sexual assault*." See generally,* http://itsonus.org/index.html#pledge  (accessed 9/26/16)*;* https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&ved=0CCMQFja bahUKEwjW2vihqpbJAhUI02MKHeaeC94&url=http%3A%2F%2Fitsonus.org%2Fassets% 2Ffiles%2FIt%27s_On_Us_Organizing_Guide_Fall_2015.pdf&usg=AFQjCNGy24MM2vn7 -N7HwwUnshc6d6q0gQ&sig2=nlpOPMfxwODg7eSMWYrbxA&cad=rja (accessed 9/26/16) (emphasis added);

b.   Suggesting individuals videotape themselves "[s]ay[ing] to camera…it's on us to recognize that if a *woman* doesn't or can't consent to sex, it's rape." *Id.,* (emphasis added);

c.   Stating: "*Never* blame the victim," "*always* be on the side of the survivor," and "*trust* the survivor."  *Id.,* (emphasis added);

d.   VP Biden's statement that those that make their rape allegations public "give millions of women hope." *Exhibit 9*, containing It's On Us Twitter Page,  ; and

e.   President Barack Obama's statement on International Day for the Elimination of Violence Against Women that: "…together we can change our culture for the better by ending violence against *women and girls*…IT'S ON US…" ; *Exhibit 10* (containing page from It's On Us Facebook page) (emphasis added).

46.     Similarly, The White House's April 2014 report entitled "Not Alone" also asserts at page 5: "[o]ne in five women is sexually assaulted in college." https://www.notalone.gov/assets/report.pdf (accessed 9/26/16).

47.     According to IU's website, there are 38,364 undergraduates enrolled at IU's main campus, approximately 51% of which are female. https://www.indiana.edu/about/rankings-statistics.html (accessed 9/26/16). Therefore, if the one in five statistic were applicable, approximately 7,673 female IU students would be sexually assaulted during their four-year stay at IU. Yet, as detailed above, IU reported 43 sexual assaults for years 2013 and 2014.

48.     Emily Yoffe's 2014 article in *Slate* refutes sexual assault statistics relied on by President Obama and/or IU. Emily Yoffe, The College Rape Overcorrection, SLATE, Dec. 7, 2014, http://www.slate.com/articles/double_x/doublex/2014/12/college_rape_campus_sexual_assault_is_a_serious_problem_but_the_efforts.html (accessed 9/26/16) Ms. Yoffe asked Christopher Krebs - the lead author of the study cited by President Obama - whether his study represented the experience of the approximately 12 million female students in America. *Id.* Mr. Krebs stated those involved in the study, "don't think one in five is a nationally representative statistic." *Id.* This was because Mr. Krebs stated his sampling of only two schools "[i]n no way . . . make[s] our results nationally representative." *Id. See also,* Heather MacDonald, *An Assault on Common Sense,* The Weekly Standard, Nov. 2, 2105, http://www.weeklystandard.com/an-assault-on-common-sense/article/1051200 (accessed 9/26/16) (detailing why a recent survey conducted by Association of American Universities has been improperly distorted to falsely suggest large percentages of female college students are being sexually assaulted on America's college campuses).

49.     Ms. Yoffe also noted that if the "one-fifth to one-quarter assertion [regarding sexual assaults on college campuses were accurate that] would mean that young American college women are raped at a rate similar to women in Congo, where rape has been used as a weapon of war." Emily Yoffe, The College Rape Overcorrection, SLATE, December 7, 2014, http://www.slate.com/articles/double_x/doublex/2014/12/college_rape_campus_sexual_assault_i s_a_serious_problem_but_the_efforts.html (accessed 9/26/16). And, Ms. Yoffe debunked the sexual assault statistics relied on by President Obama and/or IU by discussing a:

> "special report from the Bureau of Justice Statistics title 'Rape and Sexual Assault Victimization Among College-Age Females, 1995-2013' . . . [which] found that contrary to frequent assertions by some elected officials, about the particular dangers female college students face, they are less likely to be victims of sexual assault than their peers who are not enrolled in college.  The report found . . . the incidence [of sexual assault] . . . was far lower than anything approaching 1 in 5: 0.76 percent for nonstudents and 0.61 percent for students." Emily Yoffe, The Problem with Campus Sexual Assault Surveys, SLATE, Sept. 24, 2015. http://www.slate.com/articles/double_x/doublex/2015/09/aau_campus_sexual_assault_survey _why_such_surveys_don_t_paint_an_accurate.html (accessed 9/26/16)

50.     IU's legitimate goal of preventing sexual assault is *not* the issue in, nor is it the basis for, this Complaint.  Rather, this Complaint addresses State Defendants' unlawful and/or gender biased discipline of innocent male students like Farrer via sexual misconduct proceedings that afford females unconstitutional preferential treatment.

51.     State Defendants' unlawful actions and/or gender bias has created a hostile environment which in turn creates an adverse educational setting in violation of Title IX in part because IU engages in sex stereotyping discrimination based on unlawful notions of masculinity and femininity. This hostile environment causes innocent males on IU's campus to be unlawfully disciplined and interferes with males' ability to participate in or benefit from various activities including learning on campus.

52.     Although State Defendants may allege IU Policies are gender neutral, this is a pretext for State Defendants' anti-male discrimination implemented to discipline innocent male students like Farrer via sexual misconduct proceedings that afford females unconstitutional preferential treatment.   Evidence exposing this pretext includes, but is not limited to:

a) IU's "SlutWalk Bloomington" which depicts males in a gender biased light regarding sexual misconduct while empowering women against "slut-shaming" by males. http://www.idsnews.com/article/2015/04/call-for-consent   (accessed 9/26/16) (discussing same). This message was reinforced by IU's Title IX Coordinator Emily Springston who spoke at the event to a backdrop of gender-biased signs such as: "[a] little girl's dress does not make a pedophile the same way a big girl's dress does not make a rapist."  After Ms. Springston spoke, IU's Crisis Intervention Services Coordinator perpetuated the event's anti-male stereotypes by discussing how females are unfairly "labeled as sluts . . . whores . . . bitches and . . . monsters." These anti-male stereotypes were echoed by other statements at the event, such as, "Trad youth can fall off a white male orthodox cliff." *Id;*

b)  IU's "It's on Us" promotional efforts which focus on females as victims, and males as assailants.  These efforts include but are not limited to, showing the film "It Happened Here" with discussion afterward led by Leslie Fasone, IU Dean of Students, and Defendant Monroe, Office of Student Ethics, which:

(1)  Contains interviews of victims of sexual assault—all of whom are women;

(2) Advances anti-male stereotypes such as "men feel entitled to do what they want to a woman's body";

(3) Details how when female college students make allegations of sexual misconduct, the universities' role is *not* to "question her credibility but have an obligation to treat her as credible."

(4) Characterizes male students as sexual predators who must be severely disciplined because they are sexually assaulting 1 in 5 college women. http://www.ithappenedhere.org/ (accessed 9/26/16); and

c) IU's showing the film "The Hunting Ground", a film about campus sexual assault that purports to be a documentary but is in fact misleading and biased, sponsored by the Dean of Students Office, with a panel discussion after the film. "The Hunting Ground" has been widely criticized:

(1) Nineteen Harvard University professors denounced the film as "propaganda" that is "one-sided" and "biased." *(Exhibit 11,* containing Harvard University Law School Press Release);

(2) Claims to be a documentary but is biased; *"We don't operate the same way as journalists — this is a film project very much in the corner of advocacy for victims, so there would be no insensitive questions or the need to get the perpetrator's side" — The Hunting Ground co-producer Amy Herdy; See,* http://www.nationalreview.com/article/427166/hunting-ground-smoking-gun-e-mail-exposes-filmmaker-bias-against-accused (accessed 9/26/16);

(3) Features three women, whose claims of sexual assault were later largely discredited, including in one case fabricating evidence (a bloody condom that when eventually tested contained DNA of another male who was not the alleged assailant); *See*, http://www.slate.com/articles/news_and_politics/doublex/2015/06/the_hunting_ground_a_closer_look_at_the_influential_documentary_reveals.html (accessed 9/26/16); http://www.nationalreview.com/article/415269/cinematic-railroading-jameis-winston-stuart-taylor-jr (accessed 6/30/16), and http://www.thedailybeast.com/articles/2015/02/03/columbia-student-i-didn-t-rape-her.html (accessed 9/26/16).

(4) Repeatedly omits the word "alleged," thus confusing an accusation of sexual assault with a proven case, and does not offer any meaningful opportunity for the accused to respond to the charges, as would be expected in any fair, balanced documentary.

(5) Makes the false claim that one in five college women are sexually assaulted, even though the U.S. Department of Justice reports a woman's risk is less than one percent (0.61%) each year.

Altogether, the information detailed above manifests IU's pattern and practice of: (a) providing preferential treatment to females – like Zerfoss - who allege they were sexually assaulted my male students; and (b) imposing presumptions against male students – like Farrer – who are falsely accused of sexual misconduct. In addition, the allegations detailed above, and the

allegations to follow specific to Farrer, demonstrate that IU was motivated by pro-female, anti-male bias that was, at least in part, adopted to refute criticism within the student body and public press that IU was turning a blind eye to female complaints of sexual assault.

## PARTIES, JURISDICTION, VENUE

53.     Farrer currently resides in Lafayette, Indiana.

54.     Defendant IU is an instrumentality of the State of Indiana with its principal place of business located in Indiana.

55.     At all times relevant to this Complaint, Defendant Zerfoss was a student at IU. Upon information and belief, Defendant Zerfoss is currently attending IU and residing in Bloomington, IN.

56.     During time periods relevant to this Complaint, Defendant Casares acted within the scope of his employment at IU, which included, but was not limited to, serving as IU's Associate Dean of Student and Deputy Title IX Director. Defendant Casares was forced to resign from IU after being accused of sexual assault.

57.     During time periods relevant to this Complaint, Defendant Monroe acted within the scope of her employment at IU, which included, but was not limited to, serving as IU's Title IX Deputy Investigator. Upon information and belief, Defendant Monroe resides in Indiana but is no longer employed with IU. Monroe served as the Chair of the Hearing Panel for Farrer's hearing relating to Zerfoss' sexual assault allegations.

58.     During time periods relevant to this Complaint, Defendant Hernandez acted within the scope of his employment at IU, which included, but was not limited to, serving as IU's Assistant Director, Office of Student Ethics. Hernandez served as the investigator for the complaint that Zerfoss made against Farrer.

59.     During the times relevant to this Complaint, Defendant Shirk acted within the scope of her employment at IU, which included, but was not limited to, serving as an IU Hearing Panel Member and residence manager.

60.     During time periods relevant to this Complaint, Defendant Goldsmith acted within the scope of his employment at IU, which included, but was not limited to, serving as IU's Dean of Students. Goldsmith denied Farrer's appeal of the decision of the Hearing Panel. Goldsmith retired from IU in June 2016.

61.     During time periods relevant to the Complaint, Defendant Herman acted within the scope of her employment at IU, which included, but was not limited to, serving as an IU Hearing Panel Member and as an employee and doctoral candidate in the School of Education.

62.     Upon information and belief, State Defendants are acting under regulations set forth in the Indiana Code, as well as the policies, procedures, and practices of IU and are responsible for administering and/or operating IU's Polices.

63.     This action arises under Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*, the Fifth and Fourteenth Amendments to the Indiana and United States Constitution, 42 U.S.C. §1983, and Indiana common law.

64.     This Court has jurisdiction over this action by virtue of federal question jurisdiction pursuant to 28 U.S.C. §1331 and the protection of civil rights pursuant to 28 U.S.C. §1343.

65.     This Court has personal jurisdiction over Defendants because Defendants reside and/or conduct business within the State of Indiana.

66.     Venue rests with this Court pursuant to 28 U.S.C. §1391 and Southern District Civil Rule 82.1 because a substantial part of the events or omissions giving rise to the claims occurred in its judicial district.

## FARRER'S ENROLLMENT AT INDIANA UNIVERSITY
## AND INTERACTIONS WITH ZERFOSS

67.     Farrer worked diligently in high school, graduated with a good academic record, enlisted into the Indiana Army National Guard so that he could finance and attend college, and specifically chose IU to pursue his dream of a career in law enforcement.

68.     Farrer began his studies at IU on or about January 12, 2015 and enrolled in the ROTC program to finance his education. At all relevant times, Farrer met all requirements for admission to IU and was in good academic standing.

69.     Beginning in the fall semester of 2015, Farrer was also employed with the Indiana University Police Department ("IUPD") as a cadet.

70.     Farrer was a student in excellent standing at IU from January 12th until September 28th 2015, when he was wrongfully suspended—and eventually expelled—from IU as a result of Zerfoss' false allegations.

71.     Farrer was also terminated from the IUPD as a result of Zerfoss' false allegations.

72.     Farrer was also suspended from the ROTC program at IU as a result of Zerfoss' false allegations. (*Exhibit 1, pp 107-08*)

73.     Farrer met Zerfoss early in the fall semester of 2015 because he was living in an off-campus apartment and was neighbors with Zerfoss. Farrer had two roommates, Brandon Fitzmorris and Collin Huffines, and Zerfoss lived next door with her two roommates, Jamie Marks ("Marks") and Mary Southworth ("Southworth"). Early in the semester, Farrer became friends with Marks and her roommates, including Zerfoss, and spent time socializing with them at their house and socializing with Marks.  Within a couple weeks of becoming friends with the roommates, Zerfoss began flirting with Farrer and aggressively indicating that she was interested in developing an intimate relationship with Farrer. Farrer was confused by Zerfoss's interest in

him because he had learned through his interactions with Zerfoss and her roommates that Zerfoss had boyfriends in both Illinois and Indiana.

74.     The first aggressive flirting that Zerfoss directed at Farrer occurred on September 12, 2015, while Farrer was working as an IU Police Cadet at an IU football game with former Cadet Austin Bull. When Farrer checked his phone during a break from patrolling the stands, and saw that he had received text messages from Zerfoss. Farrer responded to Zerfoss. A portion of that text exchange follows:

> Zerfoss:  I ask every cop if they know you.
>
> Zerfoss:  I miss you and your husky
>
> Farrer:  Do you want a taco
>
> Zerfoss:  I need this
>
> Farrer:  Okay just grab a badge and gun and come down here.
>
> Zerfoss:  Okay, cuff me first.
>
> Farrer:  Later
>
> Zerfoss:  Meow
>
> Zerfoss:  Do you actually have cuffs

*Exhibit 12* contains the complete text exchange between Zerfoss and Farrer

75.     After receiving these texts, Zerfoss sought out Farrer in the stands of the football game.   When she located him, Zerfoss told Farrer that, "fucking a cop is on my bucket list," and touched Farrer's buttocks. After Farrer protested, Zerfoss took Farrer's hand and placed it on her breasts. Farrer explained that this was unacceptable behavior while he was on duty. Yet, Zerfoss persisted, saying, "I've been trying to hit on you since you moved in" and, "you should handcuff me sometime." She again took Farrer's wrist and placed his hand on her own buttocks. Before

Farrer could ask her to return to her seat, Zerfoss's roommate, Marks, approached and informed the group that she and Zerfoss had to leave. Zerfoss hugged Farrer, kissed him on the cheek, and she and Marks left. (*Exhibit 1, pp. 55-67, 73-75*)

76.     Following these events, Farrer and Bull approached IUPD Officers Dunn and Swope, who were nearby and witnessed the exchanged, and apologized for Zerfoss's behavior. They replied, "It's okay, man, she's just really excited to be your neighbor." (*Exhibit I, pp. 55-67, 73-75, 181-82*)

77.     Following the game, Zerfoss ran into Farrer and invited him to her house. Farrer accepted Zerfoss's invitation. During this visit, Zerfoss asked him for a kiss, which he gave to her. *Id*.

78.     The next day, September 13, 2015, Zerfoss sent the following text to Farrer:

Zerfoss:  We're home come over

Farrer:  Bring pancakes?

Zerfoss:  We're making some come now

Zerfoss:  Wait we kissed

Farrer:  We're cool though, right?

Zerfoss:  Yes

Zerfoss:  Sorry if I made you uncomfortable

Farrer:  Not at all. I'm glad we've got such a good neighborly relationship

*Exhibit 12*.

79.     Following the football game and the first kiss, Farrer's relationship with Zerfoss and her roommates was friendly. In fact, on September 22, 2015, Farrer ran into Marks while he was patrolling on campus and she invited him to come to her and her roommate's house on

September 24, 2015 for a party to celebrate Mark's birthday. Marks also texted Farrer on September 23, 2015 to invite him to the party. (*Exhibit 1, pp. 19-27*)

80.     On September 24, 2015, Farrer drank two alcoholic beverages at his apartment before going to Marks' birthday party at approximately 9:45 p.m. While at the party, he consumed 4 or 5 shots of hard liquor, which caused Farrer to become intoxicated. Farrer socialized with the other guests at the party. (*Exhibit 1, pp. 57-62*)

81.     Farrer did not see Zerfoss drink alcoholic beverages at the party, except for one sip out of a drink he was holding. Farrer knew that Zerfoss and her roommates intended to end the party in time to go out to local bars to continue Marks' birthday celebration elsewhere. Farrer never planned on going to the bars with the partygoers. (*Id.*)

82.     During the party, Farrer learned that Zerfoss had just recently broken up with her Illinois boyfriend. Zerfoss was flirtatious with Farrer during the party, including sitting on his lap, and putting his arm around her. Zerfoss continued her flirtation with Farrer by asking him to come into her room and help her choose an outfit for an upcoming event. Farrer was not comfortable with this request, but found it consistent with Zerfoss's recent flirtations with him, and looked to Marks, with whom he was better friend, for guidance. In response, Marks nodded at Farrer indicating approval. (*Id.*)

83.     While in Zerfoss' room, Marks entered because the partygoers were ready to end the party and head to the bars. Farrer left Zerfoss' bedroom at this time and went into the other room. (*Id*)

84.     Soon thereafter, Marks announced to the partygoers that Zerfoss was not feeling well and had decided to stay home and that Southworth would stay with Zerfoss. While the other partygoers prepared to head to the bars, Farrer left the party at approximately 10:50 p.m. (*Id.*)

85.     Almost as soon as Farrer arrived home, he received a phone call from Marks asking him to please come and stay with Zerfoss so that everyone else could go and drink at the bars. Upon information and belief, Marks asked Farrer to return at Zerfoss's request. Farrer thought Zerfoss was going to bed, but agreed to return to Zerfoss's apartment. Farrer returned with his dog. (*Exhibit 1, pp. 19-27, 57-62*)

86.     As soon as Farrer had entered the house and everyone else had left to go drinking, Zerfoss called Farrer into her bedroom. Farrer went into Zerfoss's room and stood at the doorway. She asked if they were alone and, upon being told they were, asked Farrer, "Do you want to fuck me?" Farrer, knowing they had both drinking and were intoxicated, declined, and stated as such. (*Exhibit 1, pp. 57-62, 187; Exhibit 15*)

87.     Undeterred, Zerfoss continued her sexual aggression towards Farrer. Specifically, Zerfoss beckoned Farrer to come closer. When he did, Zerfoss took Farrer's hand and placed it on her vagina. Farrer withdrew his hand, but Zerfoss again took Farrer's hand it put it on her vagina. Farrer resisted a second time and withdrew his hand. (*Id.*)

88.     Apparently frustrated with Farrer's lack of response to her sexual overtures, Zerfoss began to masturbate in front of Farrer. Moreover, Zerfoss directed Farrer to get her vibrator and told him where to find it.  Farrer, now very nervous and uncomfortable, retrieved the vibrator for Zerfoss. Zerfoss proceeded to use the vibrator and continued masturbating in front of Farrer, repeatedly saying Farrer's name and biting her lips. (*Id.*)

89.     Impaired by the alcohol, and enticed by Zerfoss's aggressive overtures, Farrer succumbed to Zerfoss's repeated requests and began kissing her. Zerfoss once more placed Farrer's hand on her genitals and, this time, he obliged. After a short time, Zerfoss instructed Farrer to, "put your cock in my mouth." Farrer declines, but Zerfoss requests again before grabbing

Farrer's genitals herself. Farrer, once more, obliges, and unbuckles his belt. Zerfoss then grabs Farrer's genitals and begins performing oral sex on him. (*Id*,)

90.     After performing oral sex on Farrer, Zerfoss laid down on the bed and said to Farrer, "alright, now fuck me."  Farrer prepared to oblige her request but stopped and moved away from her on the bed before penetrating her, saying, "we can't do this." In response, Zerfoss said to Farrer, "No, it's fine,"  and then resumed performing oral sex on Farrer. She then rolled over, and guided Farrer's penis into her vagina. While having sex, Farrer asked Zerfoss if she was on birth control, to which she replied, "Of course." (*Id.*)

91.     Importantly, Zerfoss does not deny that she made these sexual aggressive comments and requests to Farrer. Zerfoss' position is that the encounter was sexual assault because Farrer should have resisted because Zerfoss had been drinking. (*Exhibit 1, p. 187; Exhibit 15*)

92.     After the sexual intercourse, Zerfoss and Farrer talked and Zerfoss told Farrer with regard to the sexual intercourse, "we can do it again." Farrer declined further sexual activity and he and Zerfoss laid in bed for a few minutes until Farrer helped Zerfoss put her underwear on, got dressed, and went into the living room. (*Exhibit 1, pp. 57-62, 187; Exhibit 15*)

93.     After about a half hour, Marks texted Farrer and informed him that he could go home if Zerfoss was asleep. Farrer saw that Zerfoss was, in fact, asleep, and left the apartment. After Farrer left the apartment, he advised Marks that he had gone home, Zerfoss was asleep, and asked Marks if she would let him know when they got home. (*Exhibit 1, pp. 19-27, 57-62*)

94.     During the entire encounter, Zerfoss exhibited no signs of being incapacitated or unable to consent to sexual intercourse. Zerfoss was conscious and communicative at all times. Zerfoss did not black out (or even momentarily pass out), did not fall asleep, did not go to the bathroom to vomit and did not smell like vomit. Zerfoss was not slurring her words. Zerfoss was

not stumbling and did not need assistance to walk. In fact, Zerfoss was not only articulate in her words and actions, she was adamantly clear about her desire to engage in sexual intercourse with Farrer. (*Exhibit 1, pp. 57-62, 187; Exhibit 15*)

95.     Marks contacted Farrer when she returned home. He started to head over, and was met by Marks and Southworth outside on their porch. Southworth began aggressively berating Farrer about his sexual encounter with Zerfoss while Marks remained mostly silent. (*Exhibit 1, pp. 19-27, 52-62*)

96.     After Southworth went inside, Mary asked what happened and told Farrer, "I know how Marion can be." Farrer told Marks that Zerfoss had very aggressively sought a sexual encounter with him and that he yielded to her requests because he was intoxicated. Marks told Farrer that if he wanted to stay friends with them, he should write Zerfoss a heartfelt apology taking responsibility so that she may not feel so bad about what she had done. (*Exhibit 1, pp 19-27, 57-62*)

97.     Around the same time Marks and Southworth engaged with Farrer outside their house, Zerfoss texted her IU boyfriend. The texts are in complete sentences, use coherent language, and further demonstrate that Zerfoss was not incapacitated by alcohol, as she later claimed. (*Exhibit 1, pp. 88-96*)

98.     The following day, Jane Doe visited the Counseling and Psychological Services Center ("CAPS") as well as the IU Health Center and alleged that she was sexually assaulted. (*Exhibit 1, pp. 131-138*)

99.     On September 28, Zerfoss reported the alleged assault to the IU Office of Student Ethics and spoke with Defendant Hernandez, who would serve as the Title IX investigator. (*Exhibit 1, pp. 1-9*)

100.    On October 3, 2015, Zerfoss went to the Bloomington Police Department ("BPD"), where she filed a complaint against Farrer and provided her initial statement.[5] (*Exhibit 1, pp. 109-59*) According to her complaint with the BPD, the IU Office of Student Ethics told Zerfoss that she did not need to file a criminal complaint because, as a result of filing the complaint with the Office of Student Ethics, Farrer would be suspended from the IUPD and probably thrown out of school. (*Exhibit 1, p. 120*) The IU Office of Student Ethics made this representation about Farrer based on the mere filing of a complaint and without any investigation.

101.    The BPD conducted a second interview with Zerfoss on October 5, 2015. Southworth accompanied Zerfoss during this interview. The BPD recorded the interview. Zerfoss agreed that she made the seductive statements and overtures to Farrer about having sexual intercourse and agreed that she asked him to get her vibrator. Even though Zerfoss recalled the evening and sexual encounter with Farrer in detail, Zerfoss's accusation against Farrer was that she was "blacked out" and could not consent to sexual intercourse. (*Exhibit 1, pp. 109-59, 187; Exhibit 15*)

102.    At a point in time during the second interview, the BPD detective left the room, but the recording continued. During the detective's absence, Zerfoss and Southworth continued talking and Zerfoss stated: "…which I think maybe I did, because obviously how would he have known about my vibrator over here. Which like, whatever, I don't really—I told him though, I said maybe I did consent to sex, but I'm like throwing up drunk." (*Exhibit 1, p. 187; Exhibit 15*)

---

[5]  As a result of Zerfoss' allegations, Farrer was arrested and there multiple were news stories on the television and in the newspaper about the charges and arrest against Farrer containing his name and picture. (*Exhibit 1, pp.  67-68, 76-81*) He subsequently filed criminal charges against Zerfoss because he was subjected to the same conduct from her that she was claiming was unlawful.

103.    Zerfoss also called her father for advice while the detective was out of the room. Zerfoss was recorded telling her father the following: "but like, I was blacked out, I don't remember, do I say like no, it didn't happen? I don't know" and "my only defense, Dad, is that I was so drunk and he was sober. That's rape." (*Id.*)

104.    After finishing the conversation with her father, Zerfoss told Southworth, "And like it doesn't matter if I said yes to sex. If he's completely sober and I'm shit faced like scary alcohol content, you can't have sex with me." (*Id.*)

105.    Notably, the Monroe County Prosecutor dismissed the criminal case filed against Farrer because of Zerfoss's allegation because there was insufficient evidence to establish that Zerfoss was sexually assaulted.

106.    Upon information and belief, Zerfoss made up the story that she was "shit faced" to cover her own culpability and sexual aggression with Farrer because she was embarrassed about how forward and crass she was with Farrer and to cover her infidelity to her IU boyfriend with whom she claimed to have had a "monogamous" relationship.

107.    In advancing these false claims against Farrer, Zerfoss manifested a familiar pattern evidenced by academic studies regarding the rationale behind the high percentages of false allegations of sexual assault. *See e.g.,* Reggie D. Yager, *What's Missing From Sexual Assault Prevention and Response,* (April 22, 2015), pp.46-62; http//:ssrn.com/abstract=2697788 (accessed 9/26/16).  Specifically, these academic studies detail how most false allegations of sexual assault occur because of: (i) the need for a cover story or alibi; (ii) retribution for a real or perceived wrong, rejection or betrayal; or (iii) desire to gain sympathy or attention. *Id.,* pp.63-65.

108.    Even after the dismissal of the criminal complaint against Farrer, Zerfoss went to the    media    to    continue    to    accuse    Farrer    of    sexually    assaulting    her.

http://www.theindychannel.com/news/local-news/indiana-university-student-says-rape-allegations-are-being-ignored (accessed 9/24/16). Zerfoss also took to social media to continue her pursuit to inform others that Farrer raped her. https://www.facebook.com/marion.zerfoss (accessed 9/24/16). As Zerfoss states, she wants Farrer to feel "shame" for accepting her invitation to have sex with her. *Id.*

109.    In her pursuit to "shame" Farrer, Zerfoss conducted interviews with reporters from the Indiana Daily Student and took these reporters to IU's Office of Student Ethics. Employees of IU allowed these reporters access to the confidential disciplinary records of Farrer relating to Zerfoss's complaint sometime after the dismissal of the criminal complaint pending against Farrer and before publication of the article entitled "A Question of Consent" and contained here http://specials.idsnews.com/consent/ (accessed 12/8/16), as described:

> *Editor's note: This story is based on three months of reporting. Reporters Taylor Telford, Michael Williams and Izzy Osmundsen sifted through court documents and interviewed Marion Zerfoss. They spoke with prosecutors and consent experts and read half a dozen studies on the issue of consent. Typically, Indiana Daily Student reporters cannot access records from the Office of Student Ethics. But the reporters working on this story accompanied Zerfoss to the office, where Zerfoss allowed them to listen to the audio from the disciplinary hearing and review documents from the case file.*

*Id.*

110.    Farrer did not authorize the release of records to reporters from the Indiana Daily Student. IU never contacted Farrer to request his authorization to release records to the student newspaper. IU released this information in violation of IU Policies prohibiting the release of student disciplinary records to third parties. IU's release of Farrer's disciplinary records to reporters from the Indiana Daily Student violated IU Policies, Farrer's privacy and due proces rights, and demonstrate IU and State Defendants gender bias.

111.    Given the evidence detailed above, State Defendants knew or should have known Zerfoss understood she had initiated and voluntarily engaged in sexual intercourse with Farrer.

Further, State Defendants should have known that Zerfoss was mentally and physically capable of resisting the activity; and/or appreciating the nature of her actions. *See, Exhibit 1*. State Defendants' failure to apply IU Policies in a gender-neutral fashion in light of the facts evidences State Defendants' bias against male students such as Farrer and preference for female students such as Zerfoss.

112. Upon information and belief, State Defendants did so, in part, because IU trained Individual Defendants to equate "victim/complainants" in sexual misconduct proceedings as being females who must receive preferential treatment

113. In addition, upon information and belief, State Defendants treated Zerfoss preferentially to Farrer, in part, to avoid negative publicity and because of pressure from the federal government, the general public, and/or IU students to discipline male students accused of sexual misconduct

## IU ALLOWS ZERFOSS TO FILE A COMPLAINT AND CONDUCTS A FULL INVESTIGATION

114. As stated above, Zerfoss filed an official report with Defendant Hernandez at the Office of Student Ethics ("OSE") on September 28, 2015 accusing Farrer of sexual assault. (*Exhibit 1, pp. 1-9*)

115. Zerfoss provided the same contradictory allegation to the OSE that she provided to the BPD. Zerfoss continued to assert that she may have asked Farrer to have sex with her, but that Farrer should have resisted her seduction. Zerfoss also claimed that she was "blacked out" during the sexual intercourse, yet she was able to recall the encounter with significant detail. For example, Zerfoss recalled discussing birth control with Farrer and him helping her put her underwear on after the sexual intercourse. (*Exhibit 1*)

116.    In response to Zerfoss's complaint of sexual assault, Hernandez began a full investigation, which mainly involved interviewing witnesses with a focus on the extent of Zerfoss' alcohol consumption. *(Exhibit 1)*  From the outset, IU referred to Zerfoss by name as a "victim," thus demonstrating IU's preconceived notion that Farrer was guilty and that female complainants are victims in need of special treatment.  (*Id.*)

117.    On September 30, 2015, Hernandez advised Farrer of OSE's investigation, as follows: "on September 24-25, at an off campus location, you sexually assaulted and had sexual contact with IU Student, Marion Zerfoss, while she was in an impaired state and without consent." Attached to the Notice was the Code of Student Rights, Responsibilities & Conduct ("CSRRC"). (*Exhibit 1, pp. 12-18*)

118.    On or about September 30, 2015, Hernandez also issued a "No Contact Order" to Farrer prohibiting him from contacting Zerfoss in any manner and informing him that he had to appear for an investigation meeting with Hernandez on October 5, 2015. *Id.*

119.    Hernandez interviewed Zerfoss and her witnesses, which included her roommates and other partygoers, before interviewing Farrer to obtain his side of the story. (*Exhibit 1, pp. 1-62*) When Hernandez interviewed Marks on October 2, 2105, Marks confirmed that: (1) Zerfoss asked her to invite Farrer into her bed to lay with her; (2) she asked Farrer to return to her house to stay with Zerfoss while the rest of the partygoers went to the bars; (3) upon returning from the bars, Farrer told her he was very drunk and had sex with Zerfoss after she was very sexually aggressive to him; and (4) that she instructed Farrer to send Zerfoss the text message apologizing. (*Exhibit 1, pp. 19-27*)

120.    On October 5, 2015, Hernandez finally met with Farrer. At all times, Farrer cooperated with Hernandez. During the interview, Farrer provided Hernandez with his written

statement and asked that he be questioned after Hernandez read her statement. Farrer told Hernandez that both he and Zerfoss were drunk and that Zerfoss initiated all sexual contact. Farrer also told Hernandez that Zerfoss had engaged in similar sexually aggressive and harassing behavior towards him during the IU football game on September 12, 2015. Finally, Farrer advised Hernandez that the police investigation included transcripts, including additional support that Zerfoss consented to sexual intercourse and was not incapacitated. (*Exhibit 1, pp. 57-62, 104-06*)

### IU REFUSES TO ALLOW FARRER TO FILE COMPLAINTS AGAINST ZERFOSS AND TO INVESTIGATE FARRER'S COMPLAINT

121.    At all times during the investigation of Zerfoss's allegations, Farrer notified State Defendants that Zerfoss seduced him while he was also intoxicated on September 24, 2015 and assaulted and harassed him at the IU football game on September 12, 2015, and asked if he could bring charges against Zerfoss. However, State Defendants told Farrer that they would not institute proceedings against Zerfoss or allow him to file a formal complaint until after the complaint against him had been resolved. (*Exhibit 1, pp. 97-98*)

122.    On October 22, 2015, Hernandez reiterated to Farrer's father that no investigation of Farrer's allegations against Zerfoss would be conducted until after the complaint against Farrer was resolved. (*Id.*)

123.    On October 30, 2015, Farrer met with Hernandez and again told Hernandez that he felt he had been assaulted by Zerfoss on September 24-25, 2015 and on September 12, 2015 at the football game. Hernandez again advised him that he was not allowed to bring a complaint before the complaint against him was resolved. (*Exhibit 1, pp. 100-01*)

124.    During the investigation, Farrer also spoke with Defendant Casares about filing a claim against Zerfoss for the sexual assault Zerfoss committed on him on September 12, 2015 and

on September 24-25, 2015. Casares also advised Farrer, incorrectly and wrongfully, that he was not permitted to file a complaint against Zerfoss with the IU Title IX office.

125.    In a meeting on November 19, 2015 between Farrer, Monroe an, Monroe expressed her frustration toward Farrer's attempt to exercise his right to file a counterclaim, as follows "Ms. Monroe reiterated that we had to keep the complaints and processes separate, and she would (as many times as necessary) remind Mr. Farrer (any anyone else) that the purpose of the hearing was to decide a dinfing for the charges that have been brought against Mr. Farrer." (*Exhibit 1, p. 201*)

126.    Upon information and belief, State Defendants refused to permit Farrer to file a complaint against Zerfoss, in part, because of: their preferential treatment of females over males in the application of their Title IX polces and procedures; their efforts not to embarrass Jane Doe; their gender-based archaic belief that only men can sexually assault women; the desire to avoid negative publicity; and/or to demonstrate to the U.S. DOE that IU vigorously responds to complaints by female students alleging sexual assault.

127.    Oddly, despite State Defendants representation to Farrer and his father that Farrer could not bring a complaint of sexual misconduct against Zerfoss for either the September 12, 2015 or the September 24, 2015 incident, Hernandez advised Zerfoss that IU was conducting an investigation regarding the incident of September 12, 2015. State Defendants, however, never: notified Farrer of such investigation; allowed Farrer to file an official complaint; and never afforded Farrer any of the protections and notifications provided to Zerfoss upon filing a complaint against Farrer. (*Exhibit 1*)

128.    In addition, Hernandez's so-called "investigation" into the September 12, 2015 incident did not follow the procedures outlined in IU Policies or those followed in response to Zerfoss's complaint. For instance, the investigation was not investigated separately, but was

conducted as part of Zerfoss's complaint, and Farrer was not provided the opportunity to provide a statement. (*Exhibit 1*)

129.    Although Hernandez interviewed witnesses about the September 12, 2015 incident, Hernandez's investigation evidenced gender bias and an intent to reach the foregone conclusion that Zerfoss did not sexually assault Farrer. For example, Hernandez did not ask any of the witnesses to the September 12th incident if Zerfoss told Farrer that "fucking a cop was on her bucket list." (*Exhibit 1*) Hernandez failed to ask this question even though Bull confirmed Farrer's version of events on September 12th. (*Exhibit 1*) The failure to ask this question of any witness exhibited State Defendants' blatant disregard of its obligation to conduct a "fair and impartial investigation" into either the September 12th or the September 24-25th incident, as investigation into this statement by Zerfoss is highly relevant to both incidents.

**IU AND HERNANDEZ'S INCOMPLETE AND BIASED INVESTIGATION**

130.    State Defendants failure to ask relevant questions and failure to consider relevant evidence demonstrates its bias in favor of female students during the investigation process because they: (1) believed Zerfoss's allegations to be true from the outset and the investigation was a foregone conclusion; (2) did not want to embarrass Zerfoss; and/or (3) were motivated to avoid negative publicity relating to this incident and to criticism or sanctions because IU does not adequately address female complaints of sexual assault.

131.    On October 30, 2015, Farrer sent Hernandez the BPD discovery file which included three CDs with interviews of Farrer and Zerfoss. Farrer sent this file to Hernandez because he learned that she had never bothered to get or request the CD's of the interviews, even though Farrer had requested she do so and even though those audio interviews contain information directly related to the OSE investigation, including Zerfoss's admissions and evidence that:

- She is a flirtatious person and flirted with Farrer, asking him to come into her bedroom;

- She asked Farrer if he wanted to fuck her;

- She asked Farrer to get her vibrator;

- She was cognizant and aware of her surroundings on the night of September 24;

- She did remember telling Farrer "it's okay" or "it's fine" in response to his comment "we shouldn't be doing this" during the sexual encounter.

In addition, the BPD report confirmed that Farrer's version of events was at all times consistent, including but not limited to his assertion about how much alcohol he consumed and that Zerfoss initiated all sexual activity with him. (*Exhibit 1, pp. 109-159, 187; Exhibit 15*)

132.   Hernandez and State Defendants' investigation was unfairly biased against Farrer because the investigation focused on whether Zerfoss was unable to consent due to her level of intoxication--even though Farrer was also intoxicated and all evidence indicated that Zerfoss initiated the sex--in order to achieve the gender-biased result of finding Farrer, and other similarly situated male students who accept sexual advances from females who are also intoxicated, male students responsible of sexual assault.

133.   Because of Hernandez's gender biased investigation and violations of Farrer's Constitutional and Title IX rights detailed in part above, and despite the overwhelming evidence that Jane Doe initiated the sexual encounter and was not unable to consent due to her level of intoxication, IU unlawfully charged Farrer with sexually assaulting Zerfoss. (*Exhibit 1, pp. 166-67*).  Farrer was advised of this decision on November 11, 2015.  (*Id.*)

134.   State Defendants' aforementioned failure to consider exculpatory evidence of Farrer's innocence in favor of Zerfoss's contradictory testimony is further evidence of State

Defendants': (a) gender bias against Farrer, and/or (b) intention to forsake obligations to adjudicate Zerfoss's allegations in a fair and unbiased fashion.

135.    Upon information and belief, Hernandez's investigation was tainted by gender bias such as her equating "complainants" in sexual misconduct proceedings as being females who must receive preferential treatment in part because of pressure from the federal government.

## IU'S HEARING REGARDING ZERFOSS'S COMPLAINT

136.    On November 13, 2015, Farrer voluntarily provided IU the October 5, 2015 audio tape of Zerfoss during her second police interview for the Hearing Panel's consideration during the judicial hearing because Hernandez still had not done so. (*Exhibit*, *pp. 187, 189-90*)

137.    On November 19, 2015, the day before the Sexual Misconduct Hearing, Defendant Monroe, called Farrer to a meeting with his IU advisor, George Hegeman, a Professor Emeritus at IU. Dr. Hegeman had several questions, but Monroe refused to answer the questions because the advisor is not permitted to do anything other than explain the process to the respondent. Further, she refused to provide Farrer a copy of the template for the hearing even though it was available and he requested it. (*Exhibit 1, p. 201*)

138.    During this meeting, Monroe specifically stated that she would not serve as a judge on the panel but as the facilitator, moving the hearing forward. Monroe also specifically told Farrer that the hearing on November 20, 2015 was not to review Farrer's complaint regarding the incident of September 12, 2015; rather, she stated that the hearing was solely to adjudicate Zerfoss's complaint regarding the incident of September 24, 2015. No hearing was ever scheduled or held regarding Farrer's complaints regarding Zerfoss's violations of IU Policies on September 12th or September 24th. Farrer received no correspondence from IU about his attempt to file these complaints and was never permitted to do so.

139.    The Sexual Misconduct Hearing was held on November 20, 2015. From the outset, the hearing was rife with inequities and due process issues which violated Office of Civil Rights' ("OCR") directives, which include, but are not limited to:

a)    "Public and state-supported schools must provide due process to the alleged perpetrator" *U.S. Dep*'t Of Education Office of Civil Rights, *Dear Colleague Letter,* (Apr. 4. 2011); http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html (accessed 9/26/16);

b)  IU must employ "[p]rocedures that . . . will lead to sound and supportable decisions." *U.S. Dep*'t Of Education Office of Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students By School Employees, Other Students, or Third Parties* (Jan. 2001); http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf; (accessed 9/26/16); and

*c)* "Investigations must be adequate, reliable and impartial, including the opportunity for both parties to present witnesses and other evidence." *Id.*

140.    For example, even though Hernandez investigated the case, she did not testify at the hearing because it would interfere with her holiday travel plans. Then, during the hearing, Zerfoss's attorney served as an advocate, while Farrer's father served as his advocate. Upon information and belief, Zerfoss's attorney was permitted to counsel her and provide her questions beyond the permitted "advisory role."

141.    In addition, upon information and belief, and as detailed above, the hearing officers assigned to Farrer's Judicial Hearing - Defendants Monroe, Shirk and Herman – were: (a) biased against male students; and (b) equated "complainants" in sexual misconduct proceedings as being females who should receive preferential treatment in part because of pressure from the federal government.

142.    Moreover, upon information and belief, IU failed to adequately train and educate State Defendants and other "individuals involved in implementing IU's sexual misconduct procedures…on issues and applicable policies and procedures relating to sexual misconduct, as

well as how to conduct the investigation and hearing process in a manner that protects the safety of all parties and promotes fairness and accountability" in violation of its own CSRRC and federal requirements. (*See IU Policies*)

143.    All Individual Defendants were trained and/or supervised by Defendant Casares to conduct investigations and hearings in a manner that achieves the intended gender-biased result of favoring female students and finding male students responsible. Evidence of Casares' gender bias includes, but is not limited to his statement that he "always believes the complainant." http://jasoncasares.blogspot.com/2016/04/faith-and-belief-in-system-my-story-my.htm (accessed 9/26/16).  In other words, Casares admits his bias and admits that he starts each case believing that the respondent is guilty.[6] Upon information and belief, Casares, as IU's Deputy Title IX director, had a supervisory and/or training role for Individual Defendants, and his subordinates were likely required to perform their work consistent with his views. In addition, upon information and belief, Casares, as the head of IU's Title IX efforts was under pressure internally and from the DOE to discipline aggressively male students alleged to have engaged in sexual misconduct.

144.    Evidence of Casares' gender bias is further evidenced in a prior lawsuit in which he was named as a Defendant.  (*Exhibit 16, 17* (containing Complaint and Memorandum Contra Motion to Dismiss from *Hemington vs Arizona*).  In this lawsuit, the plaintiff alleged a pattern of behavior favoring female complainants.  For example, this lawsuit alleges: "Casares, on many occasions, stepped out of his role as a neutral adjudicator and counseled the alleged victim...In

---

[6] Casares' blog post explains his experiences surrounding the allegation of sexual assault levied against him in December 2015. In his post, he writes that false reports do happen, though rarely, but still you should always believe the complainant. Further he writes, "you should believe, but it doesn't mean you don't investigate and it does not mean you make a decision without the facts…However, I discovered that the media, general public, and professionals doing this work—do develop opinions and make decisions with only one side of the story, despite the facts...Certainly, we have so much work to do in the area of neutrality and eliminating bias."." *Exhibit 8.*  In maintaining one should "always believe the complainant," Casares' unlawfully shifts the burden of proof to male respondents like Farrer.

fact, during some of the longer meetings with the alleged victim, Casares could not indicate, from his notes, any substantive inquiry with the alleged victim into the facts and circumstances surrounding the events of October 23, 2008." *Exhibit 17,* pg. 6-8. Similarly, this lawsuit alleges: "Far from disagreeing with the alleged victim and requiring the production of these records, Casares was complicit in her failure to produce the items. He did not report her failures in his report, but he actually suggested, on one occasion, that he could view certain items of evidence and just return them to her so he would not be required to disclose them to Hemington." *Id.,* pg. 8.

145.    Further evidence supporting Casares' bias to provide preferential treatment to female complainants and inability to conduct an investigation and hearing process in a fair, unbiased manner includes his previously reported interactions with another female complainant at IU made public in the IU campus newspaper. Regarding his questioning of a male respondent accused of sexual assault during a hearing panel that he chaired, Casares was quoted as telling the complainant that he, during the hearing, "was going to try to generate a reaction from the accused that would "break him." In addition, when delivering the finding of the hearing panel to the complainant, Casares said, "I really did try to break him..." *See*, http://www.idsnews.com/section/sexual-assault2 (accessed 9/26/16).

146.    Upon information and belief, Casares used his position of authority and trust at IU to impart these beliefs upon Individual Defendants.

147.    Defendant Monroe served as the Chair of the Hearing Panel, even though Monroe had told Farrer she would not serve as a judge on the panel but would simply facilitate the proceedings. Monroe reiterated at the outset that the hearing was only addressing Zerfoss's sexual assault complaint, and not Farrer's complaints. IU posseses an audio recording of the hearing.

148.     Conducting the hearing only regarding Zerfoss' complaint confirms that that State Defendants had not investigated the September 12th incident with any intent to afford Farrer the same rights as provided to Zerfoss and/or that IU had already deemed Farrer responsible and did not believe it necessary to allow Farrer to file his complaints.

149.     Monroe should not have served as the Hearing Panel chair because she was biased against Farrer. Her bias towards Farrer prevented him from receiving a fair and impartial hearing. Monroe's bias against Farrer was evidenced, in part,  by her statements to him that he was held to the standard of a well-trained, seasoned member of the police force, when he was merely a student cadet, and that she believed he had abused his "trust" as an IUPC.

150.     Monroe's stated bias towards Farrer prohibited her from being a neutral, unbiased adjudicator, as required by IU Polices and the 2011 Dear Colleague letter. Upon information and belief, Monroe imparted these beliefs upon the entire Hearing Panel members, Defendants Shirk and Herman. Throughout the hearing, State Defendants held Farrer to a "higher standard" because of his position as an IUPD cadet. Monroe and other members of the panel wrongfully and prejudicially held Farrer to a higher standard than Zerfoss in that there were repeated statements that "he should have known better as an IU cadet." The Sexual Misconduct Policy does not allow the application of a higher standard. (*See IU Policies*)

151.     Defendants Monroe, Shirk and Herman manifest gender bias in part because they ignored credibility defects in Zerfoss's testimony and that of her witnesses when Farrer raised these issues. This manifests gender bias in part because when Casares himself became the subject of sexual assault allegations he noted: "credibility" is established through the lack of "inconsistencies" because in sexual misconduct investigations "credibility defines our work." (*Exhibit 13*)  The inconsistencies highlighted in this Complaint, in the statements of Zerfoss, and

her witnesses are: (a) multiple, (b) easily identified, and (c) significantly diminish the credibility of Zerfoss's allegations and the believability of her witness' statements, unless they are ignored as to favor a gender-biased finding.

152.    Further evidence that IU failed to adequately train and educate State Defendants, and/or that they were intent on ignoring Farrer's consistent statements to achieve a preordained gender-biased finding can be seen in their questioning of Zerfoss and her witnesses. The primary witnesses, Zerfoss, Marks, and Southworth, all changed their testimony from the time of speaking with Hernandez, talking with the Bloomington Police Department, and then when they each appeared before the judicial hearing panel. (*Exhibit 1*). The Hearing Panel did not consider the credibility of Zerfoss, in spite of patently inconsistent statements made to Hernandez, the police detective and the panel.

153.    In addition, the Hearing Panel failed to consider the evidence that demonstrated that Zerfoss initiated and consented to all sexual activity with Farrer on September 24, 2016, and that she was not incapacitated or incapable of consenting due to her level of intoxication. (*Exhibit 1*) For instance, the Hearing Panel never questioned Zerfoss on the inconsistencies between her allegation that she was incapacitated and how repeatedly asked Farrer to "fuck her,", how she  had no difficulty using her vibrator, and how she could remember specific details and conversations while "blacked out."

154.    More evidence that IU failed to adequately train and educate State Defendants is their failure to ask Zerfoss questions about the exculpatory evidence favoring Farrer in the BPD file, the IU file, and the audio/video recording between Zerfoss, Southworth, and Zerfoss's father during her second police interview. (*Exhibit 1*)

155.   As detailed above, State Defendants ignored Farrer's consistent statements regarding his innocence in order to achieve a preordained gender-biased finding adverse to Farrer.

156.   Farrer was notified of the Hearing Panel's decision finding him responsible for sexually assaulting Farrer while she was in an impaired state and expelled him from IU on December 9, 2015. (*Exhibit 1, pp. 207-13*)

157.   In making this decision, IU followed a common problem created as a result of the DOE's pressure upon universities to toughly discipline male students to combat the so-called "rape epidemic. As explained by ATIXA, an organization that trains universities on Title IX compliant, in its Tip of the Week where it explains how five colleges "got it completely wrong" in finding male students responsible for "hook-ups" when alcohol was involved.  ATIXA expressed concerns that these colleges are making "Title IX Plaintiffs" of the students who were wrongly accused.   And, ATIXA noted:

> "A common policy problem comes from failing to distinguish between intoxicated and incapacitated. Yet, the most serious issue comes from failing to implement a mens rea, if you will, within the definition. Certainly, criminal concepts like mens rea are not strictly applicable to the campus conduct process, but if we agree as I stated above that having sex with a willing, yet intoxicated person is not an offense, there must be something that the respondent does, beyond having sex, that makes a lawful act (sex) into a policy violation . . . ***there has to be something more than an intent to have sex to make this an offense. Otherwise, men are simply being punished for having sex, which is gender discrimination under Title IX, because their partners are having sex too and are not being subject to the code of conduct for doing so. Without a knowledge standard, a respondent will suffer an arbitrary and capricious application of the college's rules***." *Id.* (emphasis added).

(*Exhibit 18*)

158.   Evidence proving State Defendants reached this type of gender-biased decision  in violation of Farrer's due process and Title IX rights includes, but is not limited to the fact that Zerfoss never demonstrated she was too intoxicated to consent. In fact, Zerfoss admits that she consented to sexual activity (for example, by asking Farrer to get her vibrator and to fuck her), but

that Farrer should have resisted because she had been drinking. This admission undermines State Defendants' finding that alcohol caused Zerfoss to be unable to consent because it is a clear expression of her complete understanding of what was happening at all times during the sexual encounter.[7]

159.     Additional evidence that State Defendants violated Farrer's Constitutional and Title IX rights includes, but is not limited to, State Defendants erroneously and unlawfully shifting the burden to Farrer, essentially assuming his guilt and requiring him to prove by a preponderance of the evidence that he did not sexually assault Zerfoss.

160.     Yet more evidence that State Defendants violated Farrer's Constitutional and Title IX rights includes, but is not limited to, States Defendants failure to allow Farrer to file complaints alleging Zerfoss sexually assaulted him.

161.     Further evidence that State Defendants violated Farrer's Constitutional and Title IX rights includes, but is not limited to, the failure of IU to provide any written explanation to Farrer detailing how or why the hearing panel reached its decision. (*Exhibit 1, pp. 207-13*) When Farrer asked Monroe why he received the most extreme penalty available to IU, Monroe told Farrer that he presented a threat to the campus because of his position as a cadet with the IUPD. IU imposed this harsh penalty even though Zerfoss said she was not afraid of Farrer.

---

[7] This Court is familiar with these issues, having previously issued a preliminary injunction requiring a University to reinstate a student without restriction who had been suspended for sexual assault. *King v. DePauw Univ.*, No. 2:14-CV-70-WTL-DKL, 2014 U.S. Dist. LEXIS 117075, *27-29 (S.D. Ind. Aug. 22, 2014). This Court challenged the University hearing board's core finding that "it should have been apparent" to the accused that his accuser was "extremely intoxicated, to the point that she could not give consent" to sexual activity. *Id.,* *32. For, this Court noted: "[q]uite frankly, the Court sees very little evidence that supports this conclusion."  *Id.* information." In summarizing the implications of *King v DePauw* in a way that is indeed prescient for the case at hand, one author writes, "This is precisely the kind of concern raised by accused students who assert that colleges are not evenhanded in investigating sexual misconduct allegations." (see also http://chronicle.com/article/In-Sexual-Misconduct-Cases/148783/ and https://www.thefire.org/due-process-advocates-take-critical-look-colleges-dealing-sexual-assault-allegations/  accessed 9/26/16)

162.    On December 14, 2015, Farrer timely appealed the decision of the Hearing Panel *Exhibit 19,* containing Farrer's appeal to IU. In his appeal, Farrer presented information to demonstrate why the appeal should be granted, including, but not limited to, examples to demonstrate that the preponderance of the evidence demonstrated that Farrer was not responsible. (*Id.*)

163.    Goldsmith was responsible for deciding Farrer's appeal. The appeal put Goldsmith on notice of the unlawful actions of State Defendants and violations of IU Policies. Goldsmith had the power to remedy the Hearing Panel's unlawful actions and correct the policy violations.

164.    Even though IU's Policies required Farrer's Appeal be granted, Defendant Goldsmith rejected Farrer's appeal on December 21, 2015, as follows: "after reviewing your request, it has been determined that the basis for an appeal has not been met and the appeal will not move forward."   (*Exhibit 1, pp. 221-23*)   In doing so, Goldsmith violated Farrer's Constitutional and Title IX rights by failing to provide a sufficient evidentiary basis for rejecting Farrer's appeal.

165.    Upon information and belief, Goldsmith rejected Farrer's appeal because of his: (a) gender bias against male students and/or pressure from OCR to aggressively discipline male students alleged to have engaged in sexual misconduct (b) equating "complainants" in sexual misconduct proceedings as being females who must receive preferential treatment in part because of pressure from the federal government; (c) avoiding additional public criticism and/or criticism from student groups for not acting aggressively to discipline male students accused of sexual misconduct while IU was contemporaneously embroiled in a potential media scandal regarding the sexual assault allegations against Defendant Casares; and/or (d) failure of IU to train Goldsmith appropriately so that he could recognize (i) the myriad violations and inconsistencies in the

investigation and hearing and (ii) the failure of the hearing panel to establish the preponderance of evidence standard before finding Farrer responsible.

## STATE DEFENDANTS' VIOLATIONS OF IU POLICIES AND/OR CONSTITUTIONAL AND/OR TITLE IX RIGHTS

166.    Throughout Farrer's disciplinary investigation State Defendants violated IU Policies and/or Farrer's Constitutional and/or Title IX rights in furtherance of the anti-male gender bias detailed in this Complaint.

167.    State Defendants' conduct detailed above violated Farrer's Constitutional and/or Title IX rights and/or the CSRRC, which guarantees that all "parties will have equal opportunities to present information" and that "[t]he University will have as a priority, the interests of all parties involved…." The CSRRC delineates guarantees that all students will have equal opportunities to present information and that IU "will have as a priority, the interests of all parties involved, in regard to fairness, dignity, privacy and due process." (*Exhibit 1, pp. 14-18*)

168.    The refusal to allow Farrer to file a complaint of sexual misconduct against Zerfoss violated IU's Policies and demonstrates IU's gender bias toward male students and failure to provide equal due process rights to male students. (*See IU Policies*) No IU Policy provides that a complaint against a student for sexual misconduct cannot be filed pending resolution of another complaint. To the contrary, IU requires that all students be allowed to file a complaint when alleging sexual assault. Upon information and belief, IU has not refused to allow any female student to file a complaint of sexual misconduct. In fact, upon information and belief, IU has instituted proceedings whenever a female student has alleged sexual misconduct and presumed that her allegations are true. (*Id.*) This assertion is supported by the handout attached as *Exhibit 8 Responding to Sexual Misconduct An Employee Guide (IU Bloomington)* that IU uses to instruct its employees that it has 60 days to act on a sexual misconduct allegation.

169.    State Defendants refusal to allow Farrer to file a complaint against Zerfoss further violated the CSRRC, which provides: "The University will promptly respond to all reports of sexual misconduct alleged against a University student following the procedures outlined in this policy." (*Exhibit 1, pp. 14-18*) Finally, State Defendants refusal to allow Farrer to file a complaint violated the CSRRC's guarantee to students that "[u]pon a receipt of a report of sexual misconduct by a victim/survivor (hereinafter referred to as "complainant") or third party, the University will take immediate and appropriate steps to investigate the incident." (*Id.*)

170.    In addition, State Defendants' conduct detailed above violated Farrer's Constitutional and/or Title IX rights and/or violated IU's Sexual Misconduct Policy (UA-03), which provides that: "the University will provide a fair and impartial investigation and resolution for complaints." (*See IU Policies; s*ee also, http://stopsexualviolence.iu.edu/policies-terms/index.html (accessed 9/26/16). Upon information and belief, State Defendants' decision to engage in this conduct was motivated – in part - by the anti-male gender bias detailed in this Complaint.

171.    In addition, State Defendants' actions described herein also violated the Sexual Misconduct Policy guarantee of Title IX protection for all students "regardless of sex, gender" and provides:

> Indiana University prohibits discrimination on the basis of sex or gender in its educational programs and activities. Discrimination on the basis of sex or gender is also prohibited by federal laws, including Title VII and Title IX. This policy governs the University's response to discrimination based on sex or gender, and all forms of sexual misconduct (which includes sexual harassment, sexual violence, dating violence, domestic violence, sexual exploitation and stalking (see Definitions below). Such behaviors are against the law and are unacceptable behaviors under Indiana University policy. (See the Indiana University Non-Discrimination Policy here.) These unacceptable behaviors are hereafter referred to as "sexual misconduct." The University does not tolerate sexual misconduct and it will take action to prevent and address such misconduct. The University has jurisdiction over all Title IX and related complaints. Questions about Title IX may be directed to Indiana University's Title IX Coordinator, or the Office of Civil Rights (See Additional Contacts

below). Individuals who have experienced sexual misconduct are strongly urged to promptly report such incidents. Indiana University will respond promptly to all reports of sexual misconduct. According to the procedures below, the University will provide a fair and impartial investigation and resolution for complaints and, where appropriate, issue sanctions and remedial measures. The severity of the corrective action, up to and including termination or expulsion of the offender, will depend on the circumstances of the particular case. Any person who is a responsible employee (as defined below), at the University, such as administrators, supervisors, managers or faculty members, and who has received information or has knowledge of sexual misconduct, must make a report to designated University officials or be subject to disciplinary action (see section on Responsible Employees below). Retaliation against anyone who makes a report of sexual misconduct is prohibited by University policy as well as Title IX and other state and federal laws.

(*See IU Policies*)

172.   Defendant Casares, as the Title IX coordinator, was responsible for administration of the Sexual Misconduct Policy, which defines the duties of the Title IX Coordinator as follows:

### Duties of Title IX Coordinator

Indiana University's Title IX Coordinator will be informed of all reports of sexual misconduct, and will oversee the University's review, investigation, and resolution of those reports to ensure the University's compliance with Title IX, and related laws, and the effective implementation of this policy.  The Title IX Coordinator will have adequate training on what constitutes sexual harassment, including sexual violence.

The Title IX Coordinator is:

1. Responsible for oversight of the investigation and resolution of all reports of sexual harassment, sexual violence, stalking, and domestic and dating violence involving students, staff, and faculty;

2. Knowledgeable and trained in University policies and procedures and relevant state and federal laws;

3. Available to advise any individual, including a complainant, a respondent, or a third party, about the courses of action available at the University, both informally and formally, and in the community;

4. Available to provide assistance to any University employee regarding how to respond appropriately to a report of sexual misconduct;

5. Responsible for monitoring full compliance with all procedural requirements, record-keeping, and timeframes outlined in this policy;

6. Responsible for overseeing training, prevention, and education efforts, and any reviews of climate and culture; and University Policies UA-03 5

7. Responsible for providing the University aggregate, non-identifying information in regard to reports, investigations, resolutions, and sanctions.

(*See IU Policies*)

173.    Moreover, despite these guarantees of equity and fairness, the CSRRC and the Sexual Misconduct Policy contain several policies and/or procedures that denied Farrer and other similarly situated male students their Constitutional and Title IX rights. For instance, the CSRRC requires the respondent to attend the sexual misconduct hearing, but allows the complainant to choose whether to attend.  *Exhibit 1,* pp. 14-18. Upon information and belief, State Defendants' decision to engage in these practices was motivated – in part - by the anti-male gender bias detailed in this Complaint.

174.    State Defendants' conduct detailed above violated Farrer's Constitutional and/or Title IX rights and/or violated IU's CSRRC in determining that Zerfoss was unable to consent to sex because of her alcohol consumption. The CSRRC provides:

Personal H20d1- Physical abuse of any person, including the following: … When an individual subjects another person to sexual penetration (as defined in the Sexual Misconduct Policy, UA-03) (i) without the consent of the person, (ii) *when the individual knew or should have known that the other person was mentally or physically incapable of resisting or appreciating the nature of the other person's own conduct* . . . ." http://studentcode.iu.edu/responsibilities/on-campus-personal.html (accessed 9/26/16  emphasis added).

175.    Evidence of this violation includes, but is not limited to, the fact that the preponderance of the evidence demonstrated that Zerfoss was not mentally or physically incapable of resisting or that Zerfoss was incapable of appreciating the nature of the sexual conduct.

176.    Upon information and belief, State Defendants' decision to violate its policies was motivated, in part, by anti-male gender bias as detailed in this Complaint and, in part, was the result of inadequate training and/or refusal to conduct a fair, balanced, and unbiased investigation to avoid negative publicity and scrutiny from the DOE, IU students, and/or the general public.

### Count 1
### Defamation Per Se
(against Defendant Zerfoss only)

177.    Farrer realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

178.    Zerfoss orally and in writing defamed Farrer by falsely telling third parties that Farrer sexually assaulted Zerfoss ("Zerfoss's Defamatory Allegations").

179.    Zerfoss's Defamatory Allegations include, but are not limited to written and verbal statements to third parties, including but not limited to her roomates, ex-boyfriend(s), friends and family, and/or media outlets that Farrer raped her.

180.    Zerfoss's Defamatory Allegations were made with the intent to be understood by those that received the allegations that Farrer committed an offense involving moral turpitude that subjected Farrer to potential infamous punishment and therefore imputes the defamatory character of the oral and written statements.

181.    Zerfoss's Defamatory Allegations were false and defamatory and were made with actual malice motivated by ill will, intent to deceive, improper motive, and/or an affirmative act to injure Farrer and/or reckless disregard for the truth or falsity of the oral and/or written statements.

182.    Zerfoss's Defamatory Allegations related to this count were not made by Zerfoss in support of any complaint she filed against Farrer with IU or any governmental or quasi-governmental body.   Rather, Zerfoss's Defamatory Allegations related to this count are: (a)

completely unrelated to any complaint Zerfoss made about Farrer to IU or any governmental or quasi-governmental body; and (b) were not made in the presence of IU employees or any other governmental or quasi-governmental body involved in an action against Farrer.

183.    In the alternative, Zerfoss negligently made the aforementioned false and defamatory statements about Farrer.

184.    Zerfoss's Defamatory Allegations were made with the intent to harm Farrer's standing with IU, his future educational and employment opportunities, and his standing and reputation at IU and in the public at large.

185.    As a direct result of Zerfoss's Defamatory Allegations, the character and reputation of Farrer at IU and in the community at large was impaired and he suffered and will continue to suffer mental anguish, personal humiliation, and a great loss of reputation.

186.    Zerfoss's conduct detailed above caused Farrer to seek medical help to address profound and ongoing psychological and mental anguish.

187.    As a further direct and proximate cause of Zerfoss's Defamatory Allegations, Farrer was unlawfully disciplined by IU, which has or will result in, among other consequences and damages, loss of employment opportunities and/or wages, loss of educational opportunities, difficulty in gaining entrance to another university comparable to IU, reduced future earning capacity, and attorneys' fees.

## Count 2
## Intentional Infliction of Emotional Distress
(against Defendant Zerfoss only)

188.    Farrer realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

189.    When Zerfoss engaged in Zerfoss's Defamatory Allegations, she knew or should have known her actions would cause Farrer to suffer serious emotional injury, mental anguish, and/or a great loss of reputation.

190.    Zerfoss's Defamatory Allegations related to this count were not made by Zerfoss in support of any complaint she filed against Farrer with IU or any governmental or quasi-governmental body.   Rather, Zerfoss's Defamatory Allegations related to this count are: (a) completely unrelated to any complaint Zerfoss made about Farrer to IU or any governmental or quasi-governmental body; and (b) were not made in the presence of IU employees or any other governmental or quasi-governmental body involved in an action against Farrer.

191.    Zerfoss's Defamatory Allegations exhibited an intentional, reckless, and/or deliberate disregard of the high degree of probability that Farrer would suffer immediate and continuing emotional distress.

192.    Zerfoss's Defamatory Allegations caused Farrer to suffer profound and ongoing psychological and mental anguish.

190.    Zerfoss's Defamatory Allegations were malicious, willful and/or intentional.

191.    As a direct and proximate result of Zerfoss's aforesaid conduct, Farrer has suffered and will continue to suffer, severe and extreme emotional distress.

WHEREFORE, for Counts 1 and 2, Farrer demands judgment against Zerfoss as follows:

a.    Damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate Farrer's past and future pecuniary and/or non-pecuniary damages caused by Zerfoss's conduct;

b.    Judgment for attorneys' fees, pursuant any applicable statute;

c.   Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

d.   Pre-judgment interest and/or post judgment interest as may be permitted by law and statute; and/or

e.   Such other and further relief as this court may deem just, proper, equitable, and appropriate.

## Count 3:
## Violation of Title IX –Hostile environment sexual harassment and/or discrimination
(against IU only)

192.    Farrer realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

193.    Pursuant to 20 U.S.C. § 1681, Title IX is a federal statute designed to prevent sexual discrimination and/or harassment in educational institutions receiving federal funding.

194.    Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, applies to all public and private educational institutions that receive federal funds, including colleges and universities. The statute prohibits discrimination based on sex in a school's "education program or activity," which includes all of the school's operations. Title IX provides in pertinent part: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The United States Supreme Court has held that Title IX authorizes private suits for damages in certain circumstances.

195.    IU receives federal financial assistance and is thus subject to Title IX.

196.    Title IX includes an implied private right of action, without any requirement that administrative remedies, if any, be exhausted. An aggrieved plaintiff may seek money damages and other relief.

197.    Both the DOE and the DOJ have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or its regulations. 34 C.F.R. § 106.8(b) (Department of Education); 28 C.F.R. § 54.135(b) (Department of Justice).

198.    Title IX mandates IU afford equitable procedures and due process to Farrer which includes, but is not limited to: (a) providing adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence, and/or (b) that IU employees involved in the conduct of the procedures have adequate training.

199.    Upon information and belief, IU knew, or in the exercise of due care should have known, employees including, but not limited to, Individual Defendants received gender biased training regarding Title IX which caused them to violate Farrer's Constitutional and Title IX rights in part by equating "complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.

200.    IU's policies fail to meet the standards required by Title IX and/or Constitutional safeguards as interpreted by United States' courts regarding how institutions of higher education conduct disciplinary proceedings.

201.    Upon information and belief, in virtually all cases of campus sexual misconduct by IU students, the accused student is male and the accusing student is female.

202.     As detailed throughout this Complaint, IU created an environment in which male students accused of sexual assault, such as Farrer, are fundamentally denied due process as to be virtually assured of a finding of guilt. Such a biased and one-sided process deprives male IU students like Farrer of educational opportunities based on their gender.

203.     Upon information and belief, IU's investigation and/or discipline of Farrer was taken in order to demonstrate to DOE, DOJ, OCR, President Obama's Administration, and/or the general public that IU: (a) is aggressively disciplining male students accused of sexual assault; and (b) providing females involved in sexual misconduct proceedings with preferential treatment not provided to males.

204.     State Defendants had actual or constructive knowledge that IU's investigation and/or discipline of Farrer posed a persuasive and unreasonable risk of gender discrimination with regard to Farrer.

205.     State Defendants' actions and inactions detailed above and below set in motion a series of events that IU knew, or reasonably should have known, would cause male IU students, such as Farrer, to suffer unlawful gender discrimination.

206.     State Defendants' investigation and/or discipline of Farrer is discriminatory and based upon or motivated by Farrer's male gender.

207.     The male gender discrimination by State Defendants against Farrer includes, but is not limited to, providing preferential treatment to Zerfoss.  This preferential treatment includes, but is not limited to allowing Zerfoss, but not Farrer, the opportunity to review and respond to witness statements, present credibility witnesses, and attend and make a statement at the disciplinary hearing without having to respond to any questions.

208.    IU employees, including but not limited to Individual Defendants, unlawfully failed to exercise the authority to institute corrective measures to remedy: (a) State Defendants' violations of Farrer's rights under IU Policies, Title IX, guidance promulgated by OCR, and/or the Constitutions of the United States and/or Indiana; and/or (b) State Defendants' unlawful determination that Farrer violated IU Policies which IU adopted pursuant to federal laws and regulations related to Title IX.

209.    IU employees, including but not limited to Individual Defendants, exhibited deliberate indifference by refusing to remedy: (a) IU's violations of Farrer's rights under IU Policies, Title IX, guidance promulgated by OCR, and/or the Constitutions of the United States and/or Indiana; and/or (b) State Defendants' erroneous determination that Farrer violated IU Policies which IU adopted pursuant to federal laws and regulations related to Title IX.

210.    IU's deliberate indifference caused Farrer to suffer sexual harassment and/or discrimination so severe, pervasive or objectively offensive that it deprived Farrer of access to educational opportunities or benefits (and) caused other harms detailed above.

211.    Upon information and belief, State Defendants possess additional documentation evidencing their unlawful pattern of gender-biased decision making which favors female students over male students like Farrer who are falsely accused of sexual assault.  Evidence supporting this allegation includes, but is not limited to, IU's failure to respond fully to a public records request detailed above.

212.    Upon information and belief, State Defendants possess additional documentation evidencing their refusal to discipline female students who were alleged to have sexually assaulted male students.  Evidence supporting this allegation includes, but is not limited to, IU's failure to respond fully to a public records request detailed above.

213.    IU's hostile environment sexual harassment and/or discrimination caused Farrer to be damaged in an amount to be determined at trial.

**Count 4:**
**Violation of Title IX – Deliberate Indifference**
(against IU only)

214.    Farrer realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

215.    IU employees, including but not limited to Individual Defendants, acted with deliberate indifference towards Farrer because of his male gender.

216.    IU employees, including but not limited to Individual Defendants, unlawfully failed to exercise the authority to institute corrective measures to remedy: (a) State Defendants' violations of Farrer's rights under IU Policies, Title IX, guidance promulgated by OCR, and/or the Constitutions of the United States and/or Indiana; and/or (b) State Defendants' erroneous determination that Farrer violated IU's policies which IU adopted pursuant to federal laws and regulations related to Title IX.

217.    IU employees, including but not limited to Individual Defendants, exhibited deliberate indifference by refusing to remedy: (a) State Defendants' violations of Farrer's rights under IU Policies, Title IX, guidance promulgated by OCR, and/or the Constitutions of the United States and/or Indiana; and/or (b) IU's erroneous determination that Farrer violated IU Policies which IU adopted pursuant to federal laws and regulations related to Title IX.

218.    Upon information and belief, State Defendants possess additional documentation evidencing their gender based deliberate indifference towards Farrer and/or other similarly situated

male students.  Evidence supporting this allegation includes, but is not limited to, IU's failure to fully respond to a public records request detailed above.

219.     IU's deliberate indifference caused Farrer to be damaged in an amount to be determined at trial.

**Count 5**
**Violation of Title IX – Erroneous Outcome**
(against IU only)

220.     Farrer realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

221.     IU employees, including but not limited to Individual Defendants, unlawfully disciplined Farrer because of his male gender.

222.     By erroneously disciplining Farrer, IU violated IU Policies, Title IX, guidance promulgated by OCR, and/or the Constitutions of the United States and/or Indiana.

223.     IU employees, including but not limited to Individual Defendants, unlawfully failed to exercise the authority to institute corrective measures to remedy: (a) State Defendants' violations of Farrer's rights under IU Policies, Title IX, guidance promulgated by OCR, and/or the Constitutions of the United States and/or Indiana; and/or (b) IU's erroneous determination that Farrer violated IU Policies which IU adopted pursuant to federal laws and regulations related to Title IX.

224.     IU employees, including but not limited to Individual Defendants, exhibited deliberate indifference by refusing to remedy: (a) State Defendants' violations of Farrer's rights under IU Policies, Title IX, guidance promulgated by OCR, and/or the Constitutions of the United States and/or Indiana; and/or (b) IU's erroneous determination that Farrer violated IU Policies which IU adopted pursuant to federal laws and regulations related to Title IX.

225.    IU's conduct detailed above involved arbitrary and capricious violations of Farrer's Constitutional rights.

226.    Upon information and belief, IU possesses additional communications evidencing IU's deliberate indifference in imposing unlawful discipline on Farrer based on his gender. Evidence supporting this allegation includes, but is not limited to, IU's failure to respond to a public records request detailed above.

227.    IU's wrongful discipline of Farrer caused Farrer to be damaged in an amount to be determined at trial.

WHEREFORE, regarding Counts 3-5, Farrer demands judgment and relief against IU as follows:

a.    Damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate Farrer's past and future pecuniary and/or non-pecuniary damages caused by Defendants' conduct;

b.    Order(s) requiring IU expunge Farrer's official IU files of all information related to his interactions with Zerfoss;

c.    Order(s) requiring Farrer's reinstatement to IU;

d.    Judgment for attorneys' fees, pursuant any applicable statute;

e.    Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

f.    Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

g.   Such other and further relief as this court may deem just, proper, equitable, and appropriate.[8]

### Count 6
### Violation of the Procedural and Substantive Component of the Due Process Clause of the Fourteenth Amendment to the United States Constitution Pursuant to 42 U.S.C. §1983
(Against Individual Defendants in their official capacities for injunctive relief (and) in their personal capacity for money damages)

228.   Farrer realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

229.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

230.   Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

231.   Individual Defendants are considered state actors who owe Farrer certain protections pursuant to the Fourteenth Amendments to the United States Constitution and other Constitution provisions.

232.   Individual Defendants' conduct detailed in this Complaint violated Farrer's Due Process rights in part by allowing anti-male bias to motivate their decision to deny Farrer the

---

[8] For example, Farrer is entitled to injunctive relief in part because IU and/or Individual Defendants' discipline of Farrer is unlawful and violates Farrer' rights under IU's Policies, federal and/or state laws.  In addition, as detailed in this Complaint, IU and/or Individual Defendants' unlawful discipline of Farrer will cause irreparable harm that is certain, great, actual and not theoretical.  Moreover, IU and/or Individual Defendants' discipline cannot be remedied by an award of monetary damages because of difficulty or uncertainty in proof or calculation.  The granting of injunctive relief will cause no harm to IU and/or Individual Defendants because these defendants have no cognizable interest in the unlawful discipline of Farrer.  The granting of an injunctive relief will also advance a significant and appreciable public interest by protecting members of the public – like Farrer –from having their fundamental rights threatened by unlawful government action. Therefore, Farrer is entitled to injunctive relief which includes, but is not limited to an Order requiring IU and/or Individual Defendants:(a) expunge Farrer's official IU student file of all information related his encounter with Zerfoss; and (b) be barred from disclosing IU's aforementioned discipline of Farrer to third parties in the future.

"fundamentally fair [disciplinary] procedures" required by United States Supreme Court decisions such as Goss *v. Lopez*, 419 U.S. 565 (1975).

233.    Even without the anti-male bias detailed in the Complaint, Individual Defendants' conduct detailed above violated Farrer's Due Process rights in part by denying Farrer the "fundamentally fair [disciplinary] procedures" required by United States Supreme Court decisions such as Goss *v. Lopez*, 419 U.S. 565 (1975).

234.    Individual Defendants' conduct detailed in this Complaint violated Farrer's Due Process rights in part by irreparably damaging Farrer's right to pursue an education and future educational and employment opportunities and occupational liberty. *See e.g., Dixon v. Alabama State Board of Education*, 294 F.2d 150, cert. denied, 368 U.S. 930, 82 S. Ct. 368, 7 L.Ed.2d 193 (1961)(stating, "[i]t requires no argument to demonstrate that education is vital and, indeed, basic to civilized society . . . [i]t is most unlikely that a public college would accept a student expelled from another public college of the same state. Indeed, expulsion may well prejudice the student in completing his education at any other institution. Surely no one can question that the right to remain at the college in which the plaintiffs were students in good standing is an interest of extremely great value.").

235.    Individual Defendants' conduct violated Farrer's protected property interest in his education (and) right to pursue an education and future educational and employment opportunities and occupational liberty.

236.    Individual Defendants violated Farrer's Due Process rights in part because Farrer was denied a review by a gender-neutral and impartial decision maker.

237.    Individual Defendants violated Farrer's Due Process rights in part because Farrer was denied a "meaningful" opportunity to clear his name.  *See e.g., Matthews v. Eldridge*, 492

U.S. 319, 333 (1976) (requiring disciplinary procedures that take place "at a meaningful time and in a meaningful manner.").

238.    Individual Defendants violated Farrer's Due Process rights in part because Individual Defendants' prohibited Farrer from accessing information necessary for his defense and/or internal appeal.

239.    Individual Defendants violated Farrer's Due Process rights in part because Individual Defendants' conduct evidenced arbitrary and/or irrational behavior that was not justified by any governmental interest.

240.    Individual Defendants violated Farrer's Due Process rights in part because Individual Defendants' conduct was motivated by malice, ill will, bad faith, and/or an intent to injure Farrer.

241.    Individual Defendants violated Farrer's Due Process rights in part because they engaged in the arbitrary abuse of executive power so egregious that it shocks the conscience of the public.  Evidence of this fact is contained in publications cited herein criticizing academics for violating the Constitutional rights of male college students in the same – or similar way – that Individual Defendants violated Farrer's Due Process.

242.    Individual Defendants violated Farrer's Due Process rights in part because Farrer would not have been disciplined had Individual Defendants acted in a gender-neutral manner.

243.    Individual Defendants violated Farrer's Due Process rights in part because Individual Defendants' engaged in a gender-biased pattern and/or practice of disregarding and violating the rights of male students such as Farrer when these males were accused of sexually assaulting a female student.

244.    Individual Defendants acted, or failed to act, under color of law, to deprive Farrer's rights and privileges secured by the Fourteenth Amendment to the United States Constitution and other Constitution provisions.

245.    Individual Defendants' conduct evidenced an intentional, outrageous, and/or reckless disregard for Farrer's constitutional rights.

246.    Individual Defendants' conduct towards Farrer lacked any rational basis and/or was motivated by ill will or bad faith.

247.    As a result of Individual Defendants' Due Process violations, Farrer was suspended and suffers ongoing harm, including but not limited damage to his future educational and employment opportunities (and) and his standing and reputation which is marred in part by Individual Defendants' unlawful finding that Farrer engaged in sexual misconduct.

248.    Individual Defendants' investigation and/or discipline of Farrer deprive Farrer of his interests within the meaning of "life, liberty, or property" contained in U.S. Const. amend. XIV, § 1 in part because Defendants violate Farrer's property right to a transcript unmarred by Defendants' unlawful investigation and/or discipline of Farrer.

249.    Upon information and believe, Individual Defendants agreed to, approved, and/or ratified the various violations of Farrer's Due Process rights detailed in this Complaint.

250.    Individual Defendants had actual or constructive knowledge that they were engaging in conduct creating a pervasive and unreasonable risk of deprivation of Farrer's rights under the Fourteenth Amendments to the United States Constitution.

251.    Because of Individual Defendants' unlawful actions, Farrer is entitled to injunctive relief that requires Individual Defendants: (a) expunge Farrer's official IU student file of all information related his sexual encounter with Zerfoss; and (b) reinstate Farrer as a IU student.

252.    Because of Individual Defendants' unlawful actions, Farrer is entitled to declaratory relief that requires Individual Defendants: (a) expunge Farrer's official IU student file of all information related his encounter with Zerfoss; (b) be barred from disclosing IU's aforementioned discipline of Farrer to third parties in the future; and (c) reinstate Farrer as a IU student.

### Count 7-
### Violation of Equal Protection Clause
### of the Fourteenth Amendment to the United States Constitution
### Pursuant to 42 U.S.C. §1983
(Against Individual Defendants in their official capacities for injunctive relief (and) in their personal capacity for money damages)

253.    Farrer realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

254.    The Fourteenth Amendment to the United States Constitution prohibits gender discrimination.

255.    As evidenced by the facts and exhibits detailed above, gender discrimination improperly caused Individual Defendants unlawfully to find Farrer responsible for engaging in sexual misconduct with Zerfoss.

256.    Upon information and belief, female IU students suffer no historical disadvantage regarding the discernment of consent to intimate physical relationships with male students that would allow Individual Defendants validly to discriminate against male students like Farrer.

257.    Farrer brings these claims pursuant to 42 U.S.C. § 1983 because Individual Defendants' actions were taken by Individual Defendants under color of state law.

258.    Because of these violations, Farrer has suffered considerable emotional distress, loss of present and future earnings, humiliation, and damage to his reputation because of Individual Defendants' actions.

WHEREFORE, regarding Counts 6-7, Farrer demands judgment and relief as follows:

a.      Individual Defendants be found liable in their official capacity to Farrer for injunctive relieve requiring they: (a) expunge Farrer's official IU student file of all information related his encounter with Zerfoss; (b) be barred from disclosing IU's aforementioned discipline of Farrer to third parties in the future; and (c) reinstate Farrer as a IU student.

b.      Individual Defendants be found liable in their personal capacity for money damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate Farrer's past and future pecuniary and/or non-pecuniary damages caused by Defendants' conduct;

c.      Judgment for attorneys' fees, pursuant any applicable statute;

d.      Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

e.      Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

f.      Such other and further relief as this court may deem just, proper, equitable, and appropriate.

### Count 8 – Declaratory Judgment -
### Violation of Due Process Provisions of United States and Indiana Constitutions
(Against IU and/or Individual Defendants)

259.    Farrer realleges and incorporates all the allegations contained in the preceding paragraphs of the Complaint as though fully rewritten herein.

260.    The Fifth Amendment to the United States Constitution, made applicable to the State of Indiana by the Fourteenth Amendment, provides that no person shall be deprived of life, liberty, or property, without due process of law."

261.    The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

262.    Section 12, Article I, Indiana Constitution, guarantees that every person injured in his person, property or reputation shall have remedy by "due course of law."

263.    The Due Process Clauses of the Indiana and United States Constitutions are implicated by higher education disciplinary decisions, including the disciplinary decisions under the IU Code of Student Conduct.

264.    IU and/or Individual Defendants have a constitutional obligation to provide a fundamentally fair and reliable hearing process.

265.    IU and/or Individual Defendants have an additional obligation to provide a hearing process that is consistent with the customs of a free society, which includes recognition of the basic due process rights of students.

266.    IU and/or Individual Defendants violated Farrer's rights under the Constitutions of Indiana and the United States to the opportunity to be heard in a meaningful manner during the hearing and appeal addressed above.

267.    Farrer's interests in the results of the hearing and appeal addressed above are significant in part because:

     a.    Expulsion and the notation of expulsion from IU on Farrer's transcript denies Farrer the benefits of his education at IU;

b.   Expulsion and the notation of expulsion from IU on Farrer's transcript damages Farrer's academic and professional reputation; and/or

c.   Expulsion and the notation of expulsion from IU on Farrer's transcript has and will continue to affect Farrer's ability to enroll at other institutions of higher education and to pursue his chosen career.

268.     IU and/or Individual Defendants' violations of Farrer's Title IX and/or Constitutional Rights include, but are not limited to, the following:

a.   Engaging in gender biased investigations which irreparably tainted Farrer's aforementioned hearing and appeal;

b.   Prohibiting Farrer from effectively cross-examining witnesses who testified against him;

c.   Applying IU Policies and the gender neutral terms contained in these policies in a gender biased fashion;

d.   Even without the anti-male bias, conducting an investigation and hearing process in a manner that denied Farrer fundamentally fair procedures;

e.   Presuming Farrer guilty and/or imposing on Farrer the burden of proof regarding his innocence; and

f.   Upon information and belief, engaging in a pattern and practice of unlawfully disciplining innocence male students like Farrer in order to appease OCR or other sources of pressure expressing a desire for increased discipline of male students who are alleged to have engaged in sexual misconduct.

269.   Farrer and/or Individual Defendants have a dispute about whether the IU Policies as applied to Farrer violate the Due Process Clauses of the United States Constitution, the Due

Course of Law Clause of the Indiana Constitution, and the requirement that any hearing process be consistent with the customs of a free society.

270.     Farrer is entitled to a declaration that the IU Policies, as applied to Farrer, violate the Due Process Clause of the United States Constitution and the Due Course of Law Clause of the Indiana Constitution.

271.     Farrer is entitled to a declaration that IU Policies, as applied to Farrer, violate the Due Process Clauses of the United States Constitution and the Due Course of Law Clause of the Indiana Constitution.

272.     Farrer is entitled to reinstatement at IU.

273.     Pursuant to 42 U.S.C. §1988, Farrer is entitled to his attorney's fees incurred in bringing this action.

**Count 9 – Breach of Contract**
(Against IU only)

274.     Farrer realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein

275.     Farrer applied to and enrolled at IU and, with the assistance of his parents, paid tuition and other fees and expenses. Farrer did so in reliance on the understanding, and with the reasonable expectations, among others, that: (a) IU would implement and enforce IU Policies; and that (b) IU Policies would comply with the requirements of applicable law.

276.     IU Policies create an express contract or, alternatively, a contract implied in law or in fact, between IU and Farrer. IU violated these contracts by engaging in the conduct detailed in this Complaint.

277.     IU improperly and unlawfully applied IU's Policies in part by not affording Farrer rights to which he was entitled.

278.    IU also violated IU's Policies in part by applying an incorrect definition of consent.

279.    IU's unlawful conduct detailed in this Complaint evidences its repeated and material breaches of IU Policies as well as a breach of the implied covenant of good faith and fair dealing inherent in IU's Policies.

280.    During all times relevant to this Complaint, Farrer did all, or substantially all, of the significant things that IU Policies required Farrer do.

281.    IU's aforementioned breaches of IU's Policies were wrongful and without lawful justification or excuse. As a direct and foreseeable result of these breaches of contract, Farrer has sustained, and will continue to sustain, substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future educational and career prospects.

WHEREFORE, regarding Count 9, Farrer demands judgment and relief against IU as follows:

a.      Damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to compensate Farrer's past and future pecuniary and/or non-pecuniary damages caused by Defendants' conduct;

b.      Order(s) requiring IU to reinstate Farrer as a student and expunge Farrer's official and unofficial IU files of all information related to his interactions with Zerfoss, including but not limited to charges and sanctions served, and prohibiting IU from disclosing such information to any third party;

c.      Judgment for attorneys' fees, pursuant to any applicable statute;

     d.   Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

     e.   Pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or

     f.   Such other and further relief as this court may deem just, proper, equitable, and appropriate.

Respectfully Submitted,

/s/ Eric J. Rosenberg
Eric J. Rosenberg (Ohio Bar No. 0069958)
Tracy L. Turner (Ohio Bar No. 0069927)
Rosenberg & Ball Co. LPA
395 North Pearl Street
Granville, Ohio 43023
740.644.1027 phone
866.498.0811 fax
erosenberg@rosenbergball.com
tturner@rosenbergball.com

/s/ Guy H. Haskell
Guy H. Haskell (Atty No. 26836-53)
Haskell Law
231 West Dodds Street
Bloomington, IN 47403
812-320-3954
812-618-2998 (facsimile)
ghaskell@haskell-law.org

## JURY DEMAND

Farrer hereby demands a trial by a jury in this matter.

/s/ Tracy L. Turner
Tracy L. Turner